IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | | |
|---|---|---|---|
| GUARANTEED RATE, INC., | ) | | |
| a Delaware banking institution | ) | | |
| | ) | | |
| Plaintiff, | ) | | |
| v. | ) | No. | 12-cv-5362 |
| | ) | | |
| WARREN BARR, ANTHONY LUPESCU, | ) | | |
| 13th&State, LLC, RENAISSANT | ) | | |
| DEVELOPMENT GROUP, LLC, | ) | | |
| RENAISSANT MANAGEMENT GROUP, | ) | | |
| INC., RICHARD BORKOWSKI, | ) | | |
| JOHN BORKOWSKI, EDWARD | ) | | |
| BORKOWSKI, RJE INVESTMENTS, LLC, | ) | | |
| JIM CARROLL, VASILE SAVA, GLOBAL | ) | | |
| FINANCING INVESTMENTS, CORP., ASIF | ) | | |
| ASLAM, ASLAM GROUP, INC., JEFFREY | ) | | |
| BUDZIK, BUDZIK & DYNIA, LLC, TRACY | ) | | |
| CAGALA, STEWART TITLE GUARANTY | ) | | |
| COMPANY, ROBERT LATTAS, LATTAS | ) | | |
| LAW, LLC, a/k/a the LAW OFFICES of | ) | | |
| ROBERT D. LATTAS, HYUN SOOK KIM, | ) | | |
| ABDUR RAHMAN, IQBAL WASEEM, | ) | | |
| MICHELLE DRUSKA,  ROBERT J. JILEK, | ) | | |
| and SOUTHWEST APPRAISAL  & | ) | | |
| CONSULTING, INC. | ) | | |
| | ) | | |
| Defendants. | ) | | |

## **COMPLAINT**

Plaintiff, Guaranteed Rate, Inc ("GRI"), asserts the following Complaint against Warren

Barr, Anthony Lupescu, 13th&State, LLC, Renasissant Development Group, LLC, Renaissant

Management Group, Inc., Richard Borkowski, John Borkowski, Edward Borkowski, RJE

Investments, LLC, Jim Carroll, Vasile Sava, Global Financing Investments, Corp., Asif Aslam,

Aslam Group, Inc., Jeffrey Budzik, Budzik &Dynia, LLC, Tracy Cagala, Stewart Title Guaranty

Company, Robert Lattas, Lattas Law, LLC, a/k/a the Law Offices of Robert D. Lattas, Hyun

Sook Kim, Abdur Rahman, Iqbal Waseem, Michelle Druska, Robert J. Jilek, and Southwest

Appraisal & Consulting, Inc. (collectively the "Defendants").

**Nature of The Case**

1.      This lawsuit arises out of a wide-ranging conspiracy orchestrated by the Defendants to defraud various lenders, including GRI, in connection with the sale of condominium units at a condominium development in Chicago, Illinois, known as Vision on State. The Defendants artificially inflated the sales prices of units in the Vision on State development, recruited straw buyers to fraudulently obtain financing from GRI and other lenders, provided the straw buyers downpayments, and hired a real estate appraiser to prepare materially inaccurate appraisals as part of a scheme to sell the unsold units, to defraud GRI and other lenders out of loan proceeds, and to eliminate the personal liability of several Defendants under personal guaranties executed in connection with the construction loan used to originally finance the Vision on State development.

2.      This is an action for the following claims as a result of this conspiracy:  (1) Participation in Racketeering Enterprise-Violation of 18 U.S.C. § 1962 (C); (2) Common Law Fraud (Barr and 13th &State); (3) Common Law Fraud (Kim); (4) Common Law Fraud (Rahman); (5) Common Law Fraud (Waseem); (6) Common Law Fraud (Lupescu); (7) Common Law Fraud (Jilek and Southwest Appraisal); (8) Common Law Fraud (Lattas and the Lattas Firm); (9) Conspiracy to Defraud; (10) Breach of Contract (Lupescu); (11) Breach of Fiduciary Duty (Lupescu); (12) Breach of Contract (Druska); (13) Breach of Fiduciary Duty (Druska); (14) Negligent Misrepresentation (Jilek and Southwest Appraisal); (15) Breach of Contract (Southwest Appraisal-Unsold Unit #617); (16) Breach of Contract (Southwest Appraisal-Unsold Unit #701); (17) Breach of Contract (Southwest Appraisal-Unsold Unit #1913); (18) Negligence (Jilek and Southwest Appraisal); and (19) Negligence (Cagala and Stewart Title).

## Parties

3.　　GRI is a Delaware corporation in the mortgage banking industry with its principal place of business in Chicago, Illinois. GRI is licensed to do business in the state of Illinois.

4.　　Defendant, Warren Barr ("Barr") is a real estate developer and a resident of the state of Illinois.

5.　　Defendant, Anthony Lupescu ("Lupescu") is a former Vice President of Mortgage Lending and a resident of the state of Illinois.

6.　　Defendant, 13th & State, LLC ("13th&State"), is an Illinois limited liability company and the owner of various condominium units at the property located at 1255 S. State St., Chicago, Illinois, which is commonly known as "Vision on State."

7.　　Defendant, Renaissant Development Group, LLC ("Renaissant Development") is an Illinois limited liability company which is owned and controlled by Barr.

8.　　Defendant, Renaissant Management Group, Inc. ("Renaissant Management") is an Illinois corporation, the manager of Renaissant Development, and is owned and controlled by Barr.

9.　　Defendant, Jim Carroll ("Carroll") is a member of 13th&State and the CFO of Renaissant Management.

10.　　Defendant, Richard Borkowski ("R. Borkowski") is a member of 13th&State and a co-manager of RJE Investments, LLC.

11.　　Defendant, John Borkowski ("J. Borkowski") is a member of 13th&State and a co-manager of RJE Investments, LLC.

12.　　Defendant, Edward Borkowski ("E. Borkowski") is a member of 13th&State and a co-manager of RJE Investments, LLC.

13.    Defendant, RJE Investments, LLC ("RJE") is an Illinois limited liability company, a member of 13th& State, and the holder of a mortgage and promissory note in the amount of ten million ($10,000,000.00) from 13th&State.

14.    Defendant, Vasile Sava ("Sava") is an Illinois resident and owner of Global Financing Investments, Corp.

15.    Defendant, Global Financing Investments, Corp. ("Global Financing") is an Illinois corporation and in the business of marketing and selling condominium units in and around the Chicagoland area.

16.    Defendant, Asif Aslam ("Aslam") is a resident of the state of Illinois.

17.    Defendant, Aslam Group, Inc. ("Aslam Group") is an Illinois corporation engaged in the real estate industry and is owned and controlled by Aslam.

18.    Defendant, Jeffrey Budzik ("Budzik") is an attorney licensed to practice law in the state of Illinois.

19.    Defendant, Budzik & Dynia, LLC ("Budzik & Dynia") is a law firm with its principal place of business in Lincolnwood, Illinois.

20.    Defendant, Tracy Cagala ("Cagala") was employed by Stewart Title Guaranty Company as a closing agent.

21.    Defendant, Stewart Title Guaranty Company ("Stewart Title") is a Texas corporation and is licensed to do business in the state of Illinois.

22.     Defendant, Robert Lattas ("Lattas") is an attorney licensed to practice law in the state of Illinois.

23.    Defendant, Lattas Law, LLC a/k/a the Law offices of Robert D. Lattas (the "Lattas Firm") is a law firm with its principal place of business in Chicago, Illinois.

24.    Defendant, Hyun Sook Kim ("Mrs. Kim") is a resident of the state of Illinois and, individually, the purchaser of three condominium units at the Vision on State development.

25.    Hoon Young Kim ("Mr. Kim") is a resident of the state of Illinois, the husband of Mrs. Kim and, individually, the purchaser of two condominium units at the Vision on State development.

26.    Defendant, Abdur Rahman ("Rahman") is a resident of the state of Illinois and the purchaser of two condominium units at the Vision on State development.

27.    Defendant, Iqbal Waseem ("Waseem") is a resident of the state of Illinois and the purchaser of three condominium units at the Vision on State development.

28.    Defendant, Michelle Druska ("Druska") is a resident of the state of Illinois and a former GRI mortgage consultant who worked with and reported to Lupescu.

29.    Defendant, Robert J. Jilek ("Jilek") is a resident of the state of Illinois and a licensed real estate appraiser for Southwest Appraisal & Consulting, Inc.

30.    Defendant, Southwest Appraisal & Consulting, Inc. ("Southwest Appraisal") is an Illinois corporation engaged in the business of providing real estate appraisals and is owned and controlled by Jilek.

## **Jurisdiction and Venue**

31.    This Court has jurisdiction over the subject matter of this lawsuit pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1965. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367 (a).

32.    Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1965 because the Defendants reside in, are found in, have an agent in, and/or

transact their affairs in, the Northern District of Illinois, and because a substantial part of the events complained of occurred in this District.

**Background**

**The Construction Loan To 13th&State**

33.     On or about September 30, 2005, 13th&State obtained a construction loan in the amount of $55,725,130.00 from IndyMac Bank, F.S.B. to develop and construct condominiums at 1255 S. State in Chicago, Illinois (the "Construction Loan").

34.     On information and belief, in connection with the Construction Loan, Barr, Carroll, R. Borkowski, J. Borkowski and E. Borkowski each executed a personal guaranty in favor of IndyMac Bank as security for the loan.

35.     The Construction Loan was obtained to develop a condominium complex comprised of 253 individual residential units at 1255 S. State in Chicago, Illinois ("Vision on State").

36.     13th&State retained Sava and GFI to list and market the completed Vision on State condominium units.

37.     As of November 30, 2007, 180 residential units in the Vision on State development had been sold or were under contract and 73 units remained unsold, leaving Barr, Carroll, and the Borkowskis exposed to millions of dollars in personal liability.

**The Scheme To Defraud**

38.     In or around November of 2007, Barr, Carroll, R. Borkowski, J. Borkowski, E. Borkowski, Lattas and Aslam devised a scheme to sell the remaining 73 unsold units at the Vision on State development.

39.     Barr, Carroll, R. Borkowski, J. Borkowski and E. Borkowski, as members of 13th&State, the nominal owner of the property, needed to sell the remaining units in order to close out the Vision on State development, to eliminate their personal liability under the Construction Loan, and to repay the $10,000,000.00 loaned to 13th&State by RJE, an entity solely owned and controlled by R. Borkowksi, J. Borkowski and E. Borkowski.

40.     In or around the first half of December of 2007, Barr, Carroll, the Borkowskis, Lattas and Aslam agreed to participate in a scheme to recruit straw buyers to purchase the unsold units at artificially inflated prices. The scheme would create a revenue stream to provide buyers with illegal incentives to join the scheme to defraud GRI and other lenders. For example, Unsold Unit # 616 was listed for $255,900 as of December 8, 2007. On January 18, 2008, after the scheme was devised and put in motion, Unsold Unit #616 was re-listed for $422,372.

41.     The scheme included providing illegal incentives for the would-be buyers to purchase the units, including supplying the buyer's downpayment for the purchase, mortgage payments, and two years of pre-paid homeowner's association assessments.

42.     The excess revenue created by selling the Unsold Units at artificially inflated prices was funneled to Aslam and Aslam Group in violation of the Real Estate Settlement Procedures Act for use as the illegal incentives provided to the straw buyers recruited by Aslam and Aslam Group (*i.e.* the downpayments, mortgage payments, etc.).

43.     Aslam was not a licensed real estate broker as required by the Real Estate License Act of 2000, 225 ILCS 454/1-1 *et seq*.

44.     Barr, Carroll, the Borkowskis, Lattas and Aslam agreed to increase the listing prices of the 73 unsold units in order to insure that each sale would generate enough capital to pay off the IndyMac Bank construction loan which was secured by a mortgage on each of the

unsold units, pay off the RJE loan leaving a sufficient amount of excess cash to be used by Aslam and Aslam Group to fund future downpayments and incentives for additional buyers of units in the Vision on State development.

**The Scheme In Action**

45.     In or around December of 2007, Barr, Carroll, Aslam and the Borkowskis created a sales price schedule which identified the prices at which the 73 unsold units would be sold. The sales prices they devised would allow for all of their liabilities associated with the construction to be paid off (i.e. the Construction loan and the RJE loan) and would generate excess capital that they would funnel to Aslam to pay for the illegal incentives used to recruit the unqualified buyers to purchase the unsold units at the inflated prices.

46.     In early December of 2007, Barr, Carroll and the Borkowskis then approached Sava and GFI to have the unsold units relisted at the inflated prices which were predetermined by Barr, Caroll, Aslam, and the Borkowskis and are identified in the Unsold Unit Fee Agreement.

47.     On or about December 9, 2007, Sava and GFI, at the direction of, and in cooperation with Barr, Carroll, the Borkowskis, Lattas and Aslam, delisted the 73 unsold units from the Multiple Listing Service (the "MLS"), the service used by real estate professionals to market properties for sale (the "Unsold Units").

48.     On January 1, 2008, while the Unsold Units were delisted, 13th&State executed a mortgage for the benefit of RJE that served as security for a 2005 promissory note in the principal amount of $10,000,000.00 (the "RJE Mortgage," attached hereto as Exhibit 1, and incorporated herein by reference.)

49.     On or about January 8, 2008, in furtherance of the scheme to sell the unsold units at inflated prices to straw buyers, Barr, the Borkowskis and Carroll caused 13th&State to enter

into a contract with Aslam Group wherein Aslam agreed to recruit buyers for the unsold units at

the sales prices identified in the fee schedule created by Barr, Carroll and the Borkowskis, and

attached to the agreement (the "Unsold Unit Fee Agreement," attached hereto as Exhibit 2, and

incorporated herein by reference.) The Unsold Fee Agreement was designed to portray the

massive fees being paid to Aslam as legitimate fees earned in connection with the sale of each

specified Unsold Unit.

50.     In or around January of 2008, Barr, Aslam and Lattas met at the Greek Islands

restaurant in Chicago, Illinois. At this meeting, Barr, Aslam and Lattas discussed the scheme to

sell the Unsold Units.

51.     In or around February of 2008, Barr, Aslam and Lupescu met at Bijans Bistro

restaurant in Chicago, Illinois. At this meeting, Barr, Aslam and Lupescu discussed the scheme

to sell the Unsold Units.

52.     In or around February of 2008, Aslam, Lupescu and Budzik met at the Sofitel

hotel in Chicago, Illinois. At this meeting, Aslam, Lupescu and Budzik discussed the scheme to

sell the Unsold Units.

53.     On or about January 18, 2008, Sava and GFI relisted all of the Unsold Units on

the MLS at the pre-determined prices identified in the Unsold Unit Fee Agreement.

54.     On January 25, 2008, the RJE Mortgage was recorded with the Cook County

Recorder of Deeds solely against the Unsold Units.

55.     Each and every Unsold Unit was relisted at the inflated price, which, on average,

was approximately 34% higher than the list price of the same unit as of December 9, 2007.

56.     Despite the downward turn in the housing market, the stagnant prices plaguing the

Chicago Metro area and the nation as a whole, and the growing inventory of available

condominiums for purchase in the winter of 2007, 13th&State was relisting its inventory of available condominium units at the Vision on State Development at prices well in excess of the prices at which the same inventory had been listed and at which it was unable to be sold.

**GRI Acts As Lender For The Purchase Of Three Unsold Units**

57.     In early 2008, GRI funded the purchase of three Unsold Units in the Vision on State Development, Unsold Unit #'s 617, 1913 and 701 (the "GRI Loans").

58.     As a correspondent lender, GRI is regulated by the Department of Housing and Urban Development and extends federally related mortgage loans to borrowers with the express intention of selling the loans on the secondary market.

59.     In each instance, GRI funded the loan based on fraudulent information given by buyers recruited by Aslam, processed by Lupescu, and for which a materially inaccurate appraisal was created by Southwest Appraisal.

60.     In each instance, the GRI Loans were structured as the purchase of a principal residence.

61.     For the purposes of obtaining a federally related residential mortgage, no purchaser can have more than one principal residence.

62.     As discussed more fully below, the three Unsold Units (617, 1913 and 701) purchased with funds loaned by GRI were foreclosed on by the investor banks who purchased each loan from GRI.

**Kim Purchase Of Unsold Unit #617**

63.     On or about February 25, 2008, Mr. and Mrs. Kim were contacted by Aslam regarding the Vision on State Development.

64.     Aslam, in furtherance of the conspiracy, represented to the Kims that they could purchase units in the Vision on State development and that the down payment for any purchase would be provided. Aslam presented this as an investment opportunity to the Kims.

65.     Mrs. Kim agreed to purchase Unsold Unit # 617, along with several other purchases she was making, in the Vision on State development.

66.     On or about February 25, 2008, Aslam introduced the Kims to Lupescu, a GRI employee, in connection with Mrs. Kim's individual purchase of Unsold Unit # 617.

67.     Mr. Kim spoke with Lupescu several times by telephone in connection with his wife's purchase of Unsold Unit # 617.

68.     On or about February 25, 2008, during one telephone conversation with Lupescu, Mr. Kim stated the following:

> (a)     that the Kims lived in and owned a single family home on the north side of Chicago;
>
> (b)     that Mr. Kim and/or Mrs. Kim were purchasing multiple condominiums at Vision on State; and
>
> (c)     that the purchase of Unsold Unit # 617 was an investment and would not be occupied as a principal residence by Mr. Kim or Mrs. Kim.

(the "Kim Affidavit," attached hereto as Exhibit 3, and incorporated herein by reference.)

69.     On or about April 21, 2008, Mrs. Kim provided a completed and executed Uniform Loan Application to Lupescu and Druska at GRI by facsimile (the "Kim Loan Application," attached hereto as Exhibit 4, and incorporated herein by reference.)

70.    The Kim Loan Application included the following representations from the Kims:

(a)    that Unsold Unit # 617 was to be occupied as a principal residence; and

(b)    that the Kims would provide a 10% down payment towards the purchase price of Unsold Unit # 617.

(the "Kim Statements") (*See* Ex. 4, Kim Loan Application).

71.    The Kim Statements in the Kim Loan Application submitted to GRI were false and were material misrepresentations that induced GRI into making the Kim Loan.

72.    Mrs. Kim knew the Kim Statements were false when they submitted the Kim Loan Application to GRI on or about April 21, 2008

73.    Mrs. Kim submitted the Kim Loan Application knowing the Kim Statements were false with the intent that GRI rely on the statements in the Kim Loan Application, including the Kim Statements.

74.    In reliance on the Kim Loan Application and the false Kim Statements, GRI agreed to fund Mrs. Kim's purchase of Unsold Unit # 617 at the Vision on State Development.

75.    Mrs. Kim purchased Unsold Unit # 617 for the purchase price of $438,000.00.

76.    Mrs. Kim obtained a loan from GRI in the amount of $373,000.00.

77.    The closing of the purchase of Unsold Unit # 617 occurred on May 2, 2008 at the offices of Stewart Title.

78.    Cagala, a Stewart Title employee, acted as the closing agent.

**Mrs. Kim Did Not Provide the 10% Down Payment At The Closing Of Unsold Unit # 617**

79.    Pursuant to the settlement statement and the terms of the loan, Mrs. Kim was required to bring $42,169.15 to the closing on May 2, 2008. (the "Kim HUD-1," attached hereto as Exhibit 5, and incorporated herein by reference.)

80.    Mrs. Kim did not bring $42,169.15 to the closing.

81.     Instead, Budzik, the attorney representing Mrs. Kim, obtained a cashier's check from Aslam in the amount of $42,169.15 and brought it to the closing.

**Mrs. Kim Did Not Intend To And Never Used Unsold Unit # 617 As A Principal Residence**

82.     On May 2, 2008, at the closing for Unsold Unit # 617, Kim executed an Occupancy and Financial Status Affidavit and swore that, within 60 days of the closing date, she would occupy Unsold Unit # 617 as her principal residence and would continue to do so for a period of one year (the "Kim Occupancy Affidavit," attached hereto as Exhibit 6, and incorporated herein by reference.)

83.     Cagala notarized the Kim Occupancy Affidavit.

84.     Kim never occupied Unsold Unit # 617 as her principal residence.

**Mrs. Kim Intentionally Concealed Her Purchase of Unsold Unit #717 From GRI**

85.     On May 2, 2008, the same day Mrs. Kim purchased Unsold Unit # 617 with a loan from GRI, Mrs. Kim also purchased Unsold Unit # 717 with a loan from another lender. That loan was never identified to GRI by Mrs. Kim.

86.      Mrs. Kim's purchase of Unsold Unit # 717 was also structured as a purchase of a principal residence.

87.     The closing of Unsold Unit # 717 also took place at Stewart Title and Cagala acted as the closing agent for this transaction as well.

88.     Budzik also represented Mrs. Kim act the closing of Unsold Unit # 717.

**Rahman Purchase Of Unsold Unit #1913**

89.     On or about February 27, 2008, Rahman was contacted by Aslam regarding an investment opportunity at the Vision on State Development.

13

90.     Aslam, in furtherance of the conspiracy, represented to Rahman that he could purchase multiple units in the Vision on State development and that the down payment for any purchase would be provided by Aslam.

91.     Rahman expressed his interest in this investment opportunity and Rahman agreed to purchase Unsold Unit # 1913, along with another purchase he was making in the Vision on State development.

92.     Later that same day, Aslam introduced Rahman to Lupescu in connection with Rahman's purchase of Unsold Unit # 1913.

93.     Rahman spoke with Lupescu several times by telephone in connection with his purchase of Unsold Unit # 1913.

94.     On or about February 27, 2008, Rahman provided a completed and executed Uniform Loan Application to Lupescu and Druska at GRI by facsimile (the "Rahman Loan Application," attached hereto as Exhibit 7.)

95.     The Rahman Loan Application included the following representations from Rahman:

      (a)     that Unsold Unit # 1913 was to be occupied as a principal residence; and

      (b)     that Rahman would provide a 10% down payment towards the purchase price of Unsold Unit # 1913.

(the "Rahman Statements") (*See* Ex. 7, Rahman Loan Application.)

96.     The Rahman Statements in the Rahman Loan Application submitted to GRI were false and were material misrepresentations that induced GRI into making the Rahman Loan.

97.     Rahman knew the Rahman Statements were false when he submitted the Rahman Loan Application to GRI on or about February 27, 2008.

98. Rahman submitted the Rahman Loan Application knowing the Rahman Statements were false with the intent that GRI rely on the statements in the Rahman Loan Application, including the Rahman Statements.

99. In reliance on the Rahman Loan Application and the false Rahman Statements, GRI agreed to fund Rahman's purchase of Unit # 1913 at the Vision on State Development.

100. Rahman purchased Unsold Unit #1913 for the purchase price of $438,000.00.

101. In connection with his purchase of Unsold Unit # 1913, Rahman obtained a loan from GRI in the amount of $390,399.00.

102. The closing of the purchase of Unsold Unit # 1913 occurred on March 13, 2008 at the offices of Stewart Title.

103. Cagala, a Stewart Title employee, acted as the closing agent for Rahman's purchase of Unsold Unit # 1913.

**Rahman Did Not Provide the 10% Down Payment At The Closing Of Unsold Unit # 1913**

104. Pursuant to the settlement statement, Rahman was required to bring $43,879.55 to the closing on March 13, 2008. (the "Rahman HUD-1," attached hereto as Exhibit 8, and incorporated herein by reference.)

105. Rahman did not bring $43,879.55 to the closing.

106. Instead, Budzik, the attorney representing Rahman, obtained a cashier's check from Aslam in the amount of $43,879.55 and brought it to the closing.

**Rahman Did Not Intend To And Never Used Unsold Unit # 1913 As A Principal Residence**

107. Rahman never intended to and never used Unsold Unit # 1913 as a principal residence despite his representations to that effect in both his loan application and at the closing of his purchase of Unsold Unit # 1913.

108.     At the closing on March 13, 2008, Rahman executed an Occupancy and Financial Status Affidavit and swore that, within 60 days of the closing date, he would occupy Unsold Unit # 1913 as his principal residence and would continue to do so for a period of one year (the "Rahman Occupancy Affidavit," attached hereto as Exhibit 9, and incorporated herein by reference.)

109.     Cagala notarized the Rahman Occupancy Affidavit.

**Rahman Intentionally Concealed His Purchase of Unsold Unit #1813 From GRI**

110.     On April 8, 2008, less than one month after Rahman purchased Unsold Unit # 1913 with a loan from GRI, Rahman purchased Unsold Unit # 1813 with a loan from another lender. That loan was never identified to GRI by Rahman. Rahman also represented that Unsold Unit # 1813 would be used as his principal residence.

111.     Rahman failed to disclose to GRI that he was securing a loan from another lender for the purchase of Unsold Unit # 1813.

112.     On information and belief, Rahman never occupied Unsold Unit #1813 as his principal residence.

**Waseem Purchase Of Unsold Unit # 701**

113.     On or about February 20, 2008, Waseem was contacted by Aslam regarding an investment opportunity at the Vision on State Development.

114.     Aslam, in furtherance of the conspiracy, represented to Waseem that he could purchase multiple units in the Vision on State development and that the down payment for any purchase would be provided by Aslam.

115.     Waseem expressed his interest in this investment opportunity and Waseem agreed to purchase Unsold Unit # 701, along with another purchase he was making, in the Vision on State development.

116.     Later that same day, Aslam introduced Waseem to Lupescu in connection with Waseem's purchase of Unsold Unit # 701.

117.     Waseem spoke with Lupescu several times by telephone in connection with his purchase of Unsold Unit # 701.

118.     On or about February 25, 2008, Waseem provided a completed and executed Uniform Loan Application to Lupescu and Druska at GRI by facsimile (the "Waseem Loan Application," attached hereto as Exhibit 10, and incorporated herein by reference.)

119.     The Waseem Loan Application included the following representations from Waseem:

(a)     that Unsold Unit # 701 was to be occupied as his principal residence;

(b)     that Waseem would provide a 10% down payment towards the purchase price of Unsold Unit # 701; and

(c)     that Waseem only owned one parcel of property located at 225 Wildberry Court, #1A., Schaumburg, Illinois 60193.

(the "Waseem Statements") (*See* Ex. 10, Waseem Loan Application.)

120.     The Waseem Statements in the Waseem Loan Application submitted to GRI were false and were material misrepresentations that induced GRI into making the Waseem Loan

121.     Waseem knew the Waseem Statements were false when he submitted the Waseem Loan Application to GRI on February 25, 2008.

122.     Waseem submitted the Waseem Loan Application knowing the Waseem Statements were false with the intent that GRI rely on the statements in the Waseem Loan Application, including the Waseem Statements.

123.     In reliance on the Waseem Loan Application and the false Waseem Statements, GRI agreed to fund Waseem's purchase of Unit # 701 at the Vision on State Development.

124.     Waseem purchased Unsold Unit # 701 for the purchase price of $438,000.00.

125.     In connection with his purchase of Unsold Unit # 701, Waseem obtained a loan from GRI in the amount of $394,200.00.

126.     The closing of the purchase of Unsold Unit # 701 occurred on March 13, 2008 at the offices of Stewart Title.

127.     Cagala, a Stewart Title employee, acted as the closing agent for Waseem's purchase of Unsold Unit # 701.

**Waseem Did Not Provide the 10% Down Payment At The Closing Of Unsold Unit # 701**

128.     Pursuant to the settlement statement, Waseem was required to bring $44,310.19 to the closing on March 13, 2008. (the "Waseem HUD-1," attached hereto as Exhibit 11, and incorporated herein by reference.)

129.     Waseem did not bring $44,310.19 to the closing.

130.     Instead, Budzik, the attorney representing Waseem, obtained a cashier's check from Aslam in the amount of $44,310.19 and brought it to the closing.

**Waseem Did Not Intend To And Never Used Unsold Unit # 701 As His Principal Residence**

131.     On February 28, 2008, just two weeks before his purchase of Unsold Unit #701, Waseem's wife, Samaira Waseem, purchased Unsold Unit #1914 as a principal residence.

132.     Waseem and his wife, Samaira were and are at all times relevant herein, married and living together.

133.     The closing of Samaira Waseem's purchase of Unsold Unit # 1914 took place at Stewart Title.

134.     Cagala, a Stewart Title employee, acted as the closing agent for Samaira Waseem's purchase of Unsold Unit # 1914.

135.     Samaira Waseem was represented by Budzik at the closing of Unit # 1914.

136.     On March 13, 2008, at the closing of Unsold Unit # 701, Waseem executed an Occupancy and Financial Status Affidavit and swore that, within 60 days of the closing date, he would occupy Unsold Unit # 701 as his principal residence and would continue to do so for a period of one year (the "Waseem Occupancy Affidavit," attached hereto as Exhibit 12, and incorporated herein by reference.)

137.     Cagala notarized the Waseem Occupancy Affidavit.

138.     Waseem never occupied Unsold Unit # 701 as his principal residence.

**Waseem Intentionally Concealed His Purchase of
Unsold Unit #'s 1906 and 1908 From GRI**

139.     Prior to his purchase of Unsold Unit # 701, Waseem purchased two other Unsold Units at the Vision on State development.

140.     On March 12, 2008, the day before Waseem was to close on Unsold Unit # 701, Waseem purchased Unsold Unit # 1906 at a purchase price of $466,596.00 and obtained a loan in the amount of $384,837.00 from another lender.

141.     Waseem never disclosed to GRI that he was purchasing Unsold Unit # 1906 or that he had obtained a loan in the amount of $384,837.00.

142.     Also on March 12, 2008, Waseem purchased Unsold Unit #1908 at a purchase price of $467,748.00 and obtained a loan in the amount of $384,300.00.

143.     Waseem never disclosed to GRI that he was purchasing Unsold Unit # 1908 or that he had obtained a loan in the amount of $384,300.00.

**Lupescu and Druska Originate the GRI Loans With False Information,
Certify The Accuracy Of The False Statements Contained In The Loan
Applications And Obtain False Appraisals To Support The Excessive Sales Prices**

144.     On or about July 6, 2007, GRI hired Lupescu as a Vice President of Mortgage Lending (the "Lupescu Employment Agreement," attached hereto as Exhibit 13, and incorporated herein by reference.)

145.     As a Vice President of Mortgage Lending at GRI, Lupescu's main job duties were to originate loans, collect borrower information, arrange appraisals, and ensure all information necessary for the loan to close was collected and was accurate.

146.     On or about May 9, 2007, GRI hired Druska as a mortgage consultant (the "Druska Employment Agreement," attached hereto as Exhibit 14, and incorporated herein by reference.)

147.     As the loan originator for the loans taken out by Kim, Waseem and Rahman, Lupescu was responsible for the collection of information from each borrower, including whether the borrower was going to reside in the unit they sought to purchase, as well as the information concerning the borrower's assets, liabilities, income, down payment and other financial information.

148.     As the mortgage consultant for Lupescu, Druska was responsible for insuring the information collected by Lupescu concerning the borrower (*i.e.* whether the borrower was going to reside in the units they sought to purchase, as well as the information concerning the

borrower's assets, liabilities, income, down payment and other financial information) was true and accurate.

149.    The Kim Statements, the Rahman Statements and the Waseem Statements in their respective loan applications were false.

150.    Lupescu knew at the time he received the completed loan applications from Kim, Rahman and Waseem that the Kim Statements, the Rahman Statements and the Waseem Statements contained in each loan application were false.

151.    Druska knew at the time she received the completed loan applications from Kim, Rahman and Waseem, that the Kim Statements, the Rahman Statements and the Waseem Statements contained in each loan application were false.

152.    Despite his knowledge of the false statements in each loan application, Lupescu executed each loan application, certified the accuracy of the information contained within and submitted each loan application to GRI for approval.

153.    Lupescu breached the Lupescu Employment Agreement by knowingly submitting false information to GRI in order to obtain approval for the loans to Kim, Waseem and Rahman.

154.    Druska breached the Druska Employment Agreement by knowingly submitting false information to GRI in order to obtain approval for the loans to Kim, Waseem and Rahman.

**GRI Funds The Loans For Three Unsold Units Based On False Overstated Appraisals**

155.    In connection with approving the loans for the purchase of the GRI Units, GRI required an appraisal of each of the Unsold Units be performed by a licensed appraiser.

156.    Lupescu, as the loan officer for each of the three loans, was tasked with and had an obligation to retain a licensed appraiser to conduct an appraisal and prepare an appraisal report.

157.    The appraisal is used by GRI to determine if the property being purchased is adequate collateral to secure the loan.

158.    Lupescu, in furtherance of the conspiracy and scheme to defraud GRI, retained Jilek of Southwest Appraisal to conduct an appraisal and prepare an appraisal report for each of the Unsold Units being purchased by Kim, Rahman and Waseem with loans from GRI.

159.    Lupescu and Jilek agreed that the appraisal reports prepared by Jilek for Unsold Unit #'s 617, 1913 and 701 would have an appraised value equal to or slightly higher than the purchase price identified in the purchase contracts for Unsold Unit #'s 617, 1913 and 701.

**The Jilek Appraisal of Unsold Unit #617 Contains False Statements**

160.    On or about March 14, 2008, Jilek conducted an appraisal of Unsold Unit # 617 in connection with the GRI loan to Kim.

161.    In connection with the appraisal of Unsold Unit #617 Jilek prepared a written report dated March 14, 2008 (the "Unsold Unit #617 Appraisal," p. 3, attached hereto as Exhibit 15, and incorporated herein by reference.)

162.    The Unsold Unit # 617 Appraisal contains several statements/certifications from Jilek to GRI, including but not limited to the following:

   a.  I researched, verified, analyzed and reported on any current agreement for sale for the subject property, any offering for sale of the subject property in the twelve months prior to the effective date of this appraisal, and the prior sales of the subject property for a minimum of three years prior to the effective date of this appraisal, unless otherwise indicated in this report (Ex. 15, Unsold Unit # 617 Appraisal, p. 5, Certification #5);

   b.  I have not knowingly withheld any significant information from this appraisal report and, to the best of my knowledge, all statements and information in this appraisal report are true and correct (Ex. 15, Unsold Unit # 617 Appraisal, p. 5, Certification #15);

   c.  My employment and/or compensation for performing this appraisal or any future or anticipated appraisals was not conditioned on any agreement or

understanding, written or otherwise, that I would report (or present analysis supporting) a predetermined specific value, a predetermined minimum value, a range or direction in value, a value that favors the cause of any party, or the attainment of a specific result or occurrence of a specific subsequent event (such as approval of a pending mortgage loan application.) (Ex. 15, Unsold Unit # 617 Appraisal, p. 5, Certification #18);

d.  The borrower, another lender at the request of the borrower, the mortgagee or its successors and assigns, mortgage insurers, government sponsored enterprises, and other secondary market participants may rely on this appraisal report as part of any mortgage finance transaction that involves any one or more of these parties (Ex. 15, Unsold Unit #6 17 Appraisal, p. 6, Certification #23); and

e.  Any intentional or negligent misrepresentation(s) contained in this appraisal report may result in civil liability and/or criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Section 1001, et seq., or similar state laws. (Ex. 15, Unsold Unit # 617 Appraisal, p. 6, Certification #25).

163.  The Unsold Unit # 617 Appraisal was prepared by Jilek and contains the following statements made by Jilek:

(a)  During the twelve months prior to the effective date of this appraisal, Unsold Unit # 617 was listed for $376,548.00 for 249 days;

(b)  The Date of the Contract is:  07/11/2007;

(c)  No financial assistance (loan charges, sale concessions, gift or downpayment assistance, etc.) was paid by any party on behalf of the borrower; and

(d)  The appraised value of Unsold Unit # 617 is $438,000.00 as of 3/14/2008.

(Ex. 25, Unsold Unit # 617 Appraisal, pp. 1, 3).

164.  The statements made by Jilek at Paragraph 163 above were false and were misrepresentations that induced GRI into making the Kim Loan.

165.  During the twelve months prior to the effective date of the Kim Appraisal (March 14, 2008), Unsold Unit # 617 was listed at the following prices on the following dates:  (1) $343,700.00 from April 4, 2007 through April 11, 2007; and (2) $376,548.00 from April 11, 2007 through December 7, 2007.

23

166. The Kim Contract is not dated July 11, 2007, and was executed by Barr in or around January of 2008.

167. Kim received financial assistance, including a downpayment totaling $42,169.15, a credit for closing costs totaling $10,463.98, and two years of homeowner's association assessments paid by the seller totaling $12,639.84.

168. Jilek made the statements at Paragraphs 162 through163 knowing each statement was false and with the intent that GRI rely on each statement.

169. GRI, in connection with its decision to extend a loan to Kim for the purchase of Unsold Unit # 617 relied on the statements made by Jilek in the Unsold Unit # 617 Appraisal, including those false statements identified above at Paragraphs 162 through 163.

**The Jilek Appraisal of Unsold Unit # 1913 Contains False Statements**

170. On or about March 6, 2008, Jilek conducted an appraisal of Unsold Unit # 1913 in connection with the GRI loan to Rahman.

171. In connection with the appraisal of Unsold Unit # 1913, Jilek prepared a written report dated March 6, 2008 (the "Unsold Unit # 1913 Appraisal," p. 3, attached hereto as Exhibit 16, and incorporated herein by reference.)

172. The Unsold Unit # 1913 Appraisal contains numerous statements/certifications from Jilek to GRI, including but not limited to the following:

a. I researched, verified, analyzed and reported on any current agreement for sale for the subject property, any offering for sale of the subject property in the twelve months prior to the effective date of this appraisal, and the prior sales of the subject property for a minimum of three years prior to the effective date of this appraisal, unless otherwise indicated in this report (Ex. 16, Unsold Unit # 1913 Appraisal, p. 5, Certification #5);

b. I have not knowingly withheld any significant information from this appraisal report and, to the best of my knowledge, all statements and information in this

appraisal report are true and correct (Ex. 16, Unsold Unit # 1913 Appraisal, p. 5, Certification #15);

c.   My employment and/or compensation for performing this appraisal or any future or anticipated appraisals was not conditioned on any agreement or understanding, written or otherwise, that I would report (or present analysis supporting) a predetermined specific value, a predetermined minimum value, a range or direction in value, a value that favors the cause of any party, or the attainment of a specific result or occurrence of a specific subsequent event (such as approval of a pending mortgage loan application.) (Ex. 16, Unsold Unit # 1913 Appraisal, p. 5, Certification #18);

d.   The borrower, another lender at the request of the borrower, the mortgagee or its successors and assigns, mortgage insurers, government sponsored enterprises, and other secondary market participants may rely on this appraisal report as part of any mortgage finance transaction that involves any one or more of these parties (Ex. 16, Unsold Unit # 1913 Appraisal, p. 6, Certification #23); and

e.   Any intentional or negligent misrepresentation(s) contained in this appraisal report may result in civil liability and/or criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Section 1001, et seq., or similar state laws. (Ex. 16, Unsold Unit # 1913 Appraisal, p. 6, Certification #25).

173.   Jilek made the following statements in the Unsold Unit #1913 Appraisal which is dated February 27, 2008:

(a)   During the twelve months prior to the effective date of this appraisal, Unsold Unit # 1913 was listed for $433,777.00 for 270 days;

(b)   No financial assistance (loan charges, sale concessions, gift or downpayment assistance, etc.) was paid by any party on behalf of the borrower; and

(c)   The appraised value of Unsold Unit # 1913 is $434,000.00 as of 03/06/2008.

(Ex. 16, Unsold Unit # 1913 Appraisal, pp. 1, 3).

174.   The statements made by Jilek at Paragraphs 174 through 177 above were false and were misrepresentations that induced GRI into making the Rahman Loan.

175.     During the twelve months prior to the effective date of the Unsold Unit #1913 Appraisal (March 6, 2008) Unsold Unit # 1913 was listed for $433,777.00 from January 18, 2008 through March 6, 2008.

176.     Rahman received financial assistance, including a downpayment totaling $43,879.55, a credit for closing costs totaling $9,830.85, and two years of homeowner's association assessments paid by the seller totaling $11,418.48.

177.     Jilek made the statements at Paragraphs 172 through 173 knowing the statements were false and with the intent that GRI rely on them.

178.     GRI, in connection with its decision to extend a loan to Rahman for the purchase of Unsold Unit # 1913 relied on the statements made by Jilek in the Unsold Unit # 1913 Appraisal, including those false statements identified above at Paragraphs 172 through 173.

**The Jilek Appraisal of Unsold Unit # 701 Contains False Statements**

179.     On or about February 27, 2008, Jilek conducted an appraisal of Unsold Unit # 701 in connection with the GRI loan to Waseem.

180.     In connection with the appraisal of Unsold Unit #701, Jilek prepared a written report dated February 27, 2008 (the "Unsold Unit #701 Appraisal," p. 3, attached hereto as Exhibit 17, and incorporated herein by reference.)

181.     The Unsold Unit # 701 Appraisal contains numerous statements/certifications from Jilek to GRI, including but not limited to the following:

a.     I researched, verified, analyzed and reported on any current agreement for sale for the subject property, any offering for sale of the subject property in the twelve months prior to the effective date of this appraisal, and the prior sales of the subject property for a minimum of three years prior to the effective date of this appraisal, unless otherwise indicated in this report (Ex. 17, Unsold Unit # 701 Appraisal, p. 5, Certification #5);

b.   I have not knowingly withheld any significant information from this appraisal report and, to the best of my knowledge, all statements and information in this appraisal report are true and correct (Ex. 17, Unsold Unit # 701 Appraisal, p. 5, Certification #15);

c.   My employment and/or compensation for performing this appraisal or any future or anticipated appraisals was not conditioned on any agreement or understanding, written or otherwise, that I would report (or present analysis supporting) a predetermined specific value, a predetermined minimum value, a range or direction in value, a value that favors the cause of any party, or the attainment of a specific result or occurrence of a specific subsequent event (such as approval of a pending mortgage loan application.) (Ex. 17, Unsold Unit # 701 Appraisal, p. 5, Certification #18);

d.   The borrower, another lender at the request of the borrower, the mortgagee or its successors and assigns, mortgage insurers, government sponsored enterprises, and other secondary market participants may rely on this appraisal report as part of any mortgage finance transaction that involves any one or more of these parties (Ex. 17, Unsold Unit # 701 Appraisal, p. 6, Certification #23); and

e.   Any intentional or negligent misrepresentation(s) contained in this appraisal report may result in civil liability and/or criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Section 1001, et seq., or similar state laws. (Ex. 17, Unsold Unit #701 Appraisal, p. 6, Certification #25).

182.   Jilek made the following statements in the Unsold Unit #701 Appraisal which is dated February 27, 2008:

(a)   During the twelve months prior to the effective date of this appraisal, Unsold Unit # 701 was listed for $422,372.00 for 425 days;

(b)   No financial assistance (loan charges, sale concessions, gift or downpayment assistance, etc.) was paid by any party on behalf of the borrower; and

(c)   The appraised value of Unsold Unit # 701 is $438,000.00 as of 02/27/2008.

(Ex. 17, Unsold Unit # 701 Appraisal, pp. 1, 3).

183.   The statements made by Jilek at Paragraphs 181 through 182 above were false and were misrepresentations that induced GRI into making the Waseem Loan.

184.     During the twelve months prior to the effective date of the Unsold Unit #701 Appraisal (February 27, 2008) Unsold Unit # 701 was listed at the following prices on the following dates:  (1) $306,900.00 from November 8, 2006 through March 23, 2007; (2) $390,540 from April 4, 2007 through December 7, 2007; and (3) $422,372.00 from January 18, 2008 through February 27, 2008.

185.     Waseem received financial assistance, including a downpayment totaling $44,310.19, a credit for closing costs totaling $9,813.33, and two years of homeowner's association assessments paid by the seller totaling $11,617.44.

186.     Jilek made the statements at Paragraphs 181 through 182 knowing each statement was false and with the intent that GRI rely on each statement.

187.     GRI, in connection with its decision to extend a loan to Waseem for the purchase of Unsold Unit # 701 relied on the statements made by Jilek in the Unsold Unit #701 Appraisal, including those false statements identified above at Paragraphs 181 through 182.

**13th & State Affirmatively Mistates the Amount of Earnest Money Deposits Being Made by The Purchasers of Unsold Unit #'s 617, 701 and 1913**

188.     13th and State, by and through its agent and alter ego Barr, executed sales contracts on/for the following units, each of which was placed under contract with an inflated price:

(a)     Unsold Unit # 617 (the "Kim Contract," attached hereto as Exhibit 18, and incorporated herein by reference);

(b)     Unsold Unit # 1913 (the "Rahman Contract," attached hereto as Exhibit 19, and incorporated herein by reference); and

(c)     Unsold Unit # 701 (the "Waseem Contract," attached hereto as Exhibit 20, and incorporated herein by reference.)

189.    Each of the aforementioned contracts was submitted to GRI as a necessary part of its underwriting and closing process.

190.    Each of the aforementioned contracts contained provisions identifying the collection of earnest money from each purchaser. (Ex. 18, Kim Contract, p. 1; Ex. 19, Rahman Contract, p. 1; Ex. 20, Waseem Contract, p. 1).

191.    The Kim HUD-1, Rahman HUD-1 and Waseem HUD-1, each of which was signed by 13th&State, however, state that no earnest money was credited to the respective purchases.

192.    At the time Barr executed the sales contract for Unsold Unit #'s 617, 1913 and 701, Barr knew that no Earnest Money was being collected.

193.    Barr executed the Kim Contract in or around January of 2008.

194.    At the time Barr executed the Kim Contract, Barr knew that Kim did not provide $1,000 as earnest money as stated in the contract.

195.    Barr executed the Rahman Contract on or about January 6, 2008.

196.    At the time Barr executed the Rahman Contract, Barr knew that Waseem did not provide $1,000 as earnest money as stated in the contract.

197.    Barr executed the Waseem Contract on or about January 8, 2008.

198.    At the time Barr executed the Waseem Contract, Barr knew that Rahman did not provide $1,000 as earnest money as stated in the contract.

199.    Barr knew that the Kim Contract, Rahman Contract, and Waseem Contract would be used by each respective borrower to obtain a loan from a lender like GRI.

200.    Barr misrepresented that each purchaser (Kim, Rahman and Waseem) had provided an earnest money deposit as reflected in the purchase contracts.

201.    Barr knew that any lender used by Kim, Rahman and/or Waseem would rely on the terms of the purchase contract in agreeing to extend a loan, including the amount of the earnest money deposit identified within the purchase contract.

202.    Barr affirmatively misstated that $1,000 earnest money was provided by Kim, Rahman and Waseem in connection with the purchases of Unsold Unit #'s 617, 1913 and 701, with the intent that GRI rely on that statements.

203.    GRI relied on the false statements within each of the purchase contracts (i.e. that an earnest money deposit had been made in a specific amount as identified in each sales contract) in extending loans to Kim, Rahman and Waseem.

**13th&State Includes False Statements In the HUD-1's
at Various Closings; 13th&State Conceal The Massive Fees
Paid To Aslam/Aslam Group In Connection With The Sale of Each Unsold Unit**

204.    Each of the foregoing purchases was closed at Stewart Title on the following dates:

      (a)    Unsold Unit # 617 – Kim, on or about May 2, 2008;

      (b)    Unsold Unit # 1913 – Rahman, on or about March 13, 2008; and

      (c)    Unsold Unit # 701 – Waseem, on or about March 13, 2008.

205.    In connection with the above mentioned closings, Settlement HUD-1's were executed by Lattas on behalf of 13th&State on each of the closing dates listed above at Paragraph 197 and delivered to GRI.

206.    The HUD-1's do not reflect any earnest money being deposited by Kim, Rahman or Waseem in connection with their respective purchases of Unsold Unit #'s 617, 1913 and 701. (*See* Ex. 5, Kim HUD-1; Ex. 8, Rahman HUD-1; Ex. 11, Waseem HUD-1.)

207. The HUD-1's also do not show any payments being made to Aslam or Aslam Group. (*See* Ex. 5, Kim HUD-1; Ex. 8, Rahman HUD-1; Ex. 11, Waseem HUD-1.)

208. The Unsold Unit Fee Agreement shows that Aslam/Aslam Group stood to receive illegal fees from 13th&State in connection with the sales of Unsold Unit #'s 617, 701 and 1913. (*See* Ex. 2, Unsold Unit Fee Agreement).

209. 13th&State paid the illegal fees to Aslam/Aslam Group in violation of both the Real Estate License Act of 2000, 225 ILCS 454/1-1 *et seq*. and the Real Estate Settlement Procedures Act, 26 U.S.C. § 2601 *et seq*., because Aslam/Aslam Group is not a licensed broker or real estate salesperson and the fees were not disclosed on any HUD-1 settlement statement. (*See* Ex. 5, Kim HUD-1; Ex. 8, Rahman HUD-1; Ex. 11, Waseem HUD-1.)

210. After the funding of the loans, 13th & State delivered substantial fees to Aslam and Aslam Group pursuant to the Unsold Unit Fee Agreement.

211. Barr/13[th]&State provided Aslam with the following fees in connection with the sale of Unsold Unit #'s 617, 1913 and 701: (1) $72,760.83 (Unsold Unit #617); (2) $93,717.65 (Unsold Unit #1913); and (3) $60,314.64 (Unsold Unit #701). (Ex. 2, Unsold Unit Fee Agreement).

212. 13th&State concealed the payment of fees to Aslam/Aslam Group by intentionally failing to disclose them in the Kim HUD-1, Rahman HUD-1 and Waseem HUD-1, which were executed on May 2, 2008 (Unsold Unit #617) and March 13, 2008 (Unsold Units #'s 1913 and 701).

213. The Kim, Rahman and Waseem loans were approved and funded by GRI in part based on the information and statements contained in the Kim Contract, Rahman Contract and Waseem Contract as well as the Kim HUD-1, Rahman HUD-1 and Waseem HUD-1.

**Lattas Knowingly Executes Inaccurate HUD-1's At Various Closings**

214.    The Real Estate Settlement Procedures Act ("RESPA") requires a settlement

statement, or HUD-1, to be prepared in connection with the sale of property. RESPA provides as

follows:

> (c) Fees, salaries, compensation, or other payments. Nothing in this section shall be construed as prohibiting . . . (2) the payment to any person of a bona fide salary or compensation or other payment for goods or facilities actually furnished or for services actually performed, or (3) payments pursuant to cooperative brokerage and referral arrangements or agreements between real estate agents and brokers, (4) affiliated business arrangements **so long as (A) a disclosure is made of the existence of such an arrangement to the person being referred and, in connection with such referral, such person is provided a written estimate of the charge or range of charges generally made by the provider to which the person is referred** (i) in the case of a face-to-face referral or a referral made in writing or by electronic media, at or before the time of the referral (and compliance with this requirement in such case may be evidenced by a notation in a written, electronic, or similar system of records maintained in the regular course of business); (ii) in the case of a referral made by telephone, within 3 business days after the referral by telephone[,] (and in such case an abbreviated verbal disclosure of the existence of the arrangement and the fact that a written disclosure will be provided within 3 business days shall be made to the person being referred during the telephone referral)…

(26 U.S.C. § 2607 (c))(emphasis added.)

**Lattas Executes the HUD-1 Statement
in Connection With The Sale of Unsold Unit #617**

215.    On May 2, 2008, Kim closed on Unsold Unit #617.

216.    In connection with the closing of Unsold Unit #617, Lattas appeared at the closing

at the offices of Stewart Title on behalf of the seller, 13th & State.

217.    In connection with the closing of Unsold Unit # 617, the seller was required to

execute a settlement statement or HUD-1, a document required by the Real Estate Settlement

Procedures Act (Ex. 5, Kim HUD-1).

218.     The Kim HUD-1 contains the following certification to be executed by the seller: "I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement." (Ex. 5, Kim HUD-1, p. 3).

219.     The Kim HUD-1 also contains the following warning:  "It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment."  (Ex. 5, Kim HUD-1, p. 3).

220.     Lattas executed the Kim HUD-1 on May 2, 2008.

221.     At the time Lattas executed the Kim HUD-1 on May 2, 2008, Lattas knew that all of the disbursements being made by 13th & State, were not identified in the Kim HUD-1.

222.     On May 2, 2008, Lattas knew that Aslam and Aslam Group were receiving a fee ($73,760.83) in connection with Aslam's role in recruiting Kim as a buyer of Unsold Unit # 617.

223.     Despite Lattas' knowledge and awareness that Aslam and Aslam group were receiving this fee, Lattas executed the Kim HUD-1 knowing that the fee to Aslam and Aslam Group was not disclosed in the Kim HUD-1.

224.     On May 2, 2008, Lattas knew that the fee to Aslam and Aslam Group should have been disclosed in the Kim HUD-1, yet Lattas did not disclose this fee and executed the Kim HUD-1 knowing that it was inaccurate and misrepresented the disbursements being made in connection with the sale of Unsold Unit # 617.

**Lattas Executes the HUD-1 Statement**
**in Connection With The Sale Of Unsold Unit #1913**

225.     On March 13, 2008, Rahman closed on Unsold Unit #1913.

226.    In connection with the closing of Unsold Unit #1913, Lattas appeared at the closing at the offices of Stewart Title on behalf of 13th & State.

227.    In connection with the closing of Unsold Unit # 1913, the seller was required to execute a settlement statement or HUD-1, a document required by the Real Estate Settlement Procedures Act. (Ex. 8, Rahman HUD-1).

228.    The Rahman HUD-1 contains the following certification to be executed by the seller: "I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement." (Ex. 8, Rahman HUD-1, p. 3).

229.    The Rahman HUD-1 also contains the following warning: "It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment." (Ex. 8, Rahman HUD-1, p. 3).

230.    Lattas executed the Rahman HUD-1 on March 13, 2008.

231.    At the time Lattas executed the Rahman HUD-1 on March 13, 2008, Lattas knew that all of the disbursements being made by 13th & State were not identified in the Rahman HUD-1.

232.    On May 2, 2008, Lattas knew that Aslam and Aslam Group were receiving a fee ($93,717.65) in connection with Aslam's role in recruiting Rahman as a buyer of Unsold Unit #1913.

233.    Despite Lattas' knowledge and awareness that Aslam and Aslam group were receiving this fee, Lattas executed the Rahmn HUD-1 knowing that the fee to Aslam and Aslam Group was not disclosed in the Rahman HUD-1.

234.    On May 2, 2008, Lattas knew that the fee to Aslam and Aslam Group should have been disclosed in the Rahman HUD-1, yet Lattas did not disclose this fee and executed the Rahman HUD-1 knowing that it was inaccurate and misrepresented the disbursements being made in connection with the sale of Unsold Unit #1913.

**Lattas Executes the HUD-1 Statement
in Connection With The Sale Of Unsold Unit # 701**

235.    On March 13, 2008, Waseem closed on Unsold Unit # 701.

236.    In connection with the closing of Unsold Unit # 701, Lattas appeared at the closing at the offices of Stewart Title on behalf of the seller, 13th & State.

237.    In connection with the closing of Unsold Unit # 701, the seller was required to execute a settlement statement or HUD-1, a document required by the Real Estate Settlement Procedures Act, in connection with the closing of Unsold Unit # 701. (Ex.__, Waseem HUD-1).

238.    The Waseem HUD-1 contains the following certification to be executed by the seller:  "I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement." (Ex. 11, Waseem HUD-1, p. 3).

239.    The Waseem HUD-1 also contains the following warning:  "It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment."  (Ex. 11, Waseem HUD-1, p. 3).

240.    Lattas executed the Waseem HUD-1 on March 13, 2008.

241.    At the time Lattas executed the Waseem HUD-1 on March 13, 2008, Lattas knew that all of the disbursements being made by 13th & State were not identified in the Waseem HUD-1.

242. On March 13, 2008, Lattas knew that Aslam and Aslam Group were receiving a fee ($60,314.64) in connection with Aslam's role in recruiting Waseem as a buyer of Unsold Unit #701.

243. Despite Lattas' knowledge and awareness that Aslam and Aslam group were receiving this fee, Lattas executed the Waseem HUD-1 knowing that the fee to Aslam and Aslam Group was not disclosed in the Waseem HUD-1.

244. On May 2, 2008, Lattas knew that the fee to Aslam and Aslam Group should have been disclosed in the Waseem HUD-1, yet Lattas did not disclose this fee and executed the Waseem HUD-1 knowing that it was inaccurate and misrepresented the disbursements being made in connection with the sale of Unsold Unit #701.

## COUNT I

### PARTICIPATION IN RACKETEERING ENTERPRISE – VIOLATION OF 18 U.S.C. § 1962(C) (RJE, R. BORKOWSKI, J. BORKOWSKI, E. BORKOWSKI, BARR, CARROLL, 13TH&STATE, RENAISSANT MANAGEMENT, RENAISSANT DEVELOPMENT, ASLAM, ASLAM GROUP, LATTAS, THE LATTAS FIRM (the "RICO Defendants"))

1-244. GRI restates and re-alleges Paragraphs 1 through 244 above as and for Paragraphs 1 through 244 of this Count I.

245. GRI is a financial institution within the meaning of 18 USC §20.

246. GRI alleges that the RICO Defendants' actions as stated herein violate the Racketeer Influenced and Corrupt Organizations Act ('RICO"), 18 USC § 1961 et. seq, and specifically, 18 USC § 1962 (c).

247. At all times, GRI was and is a "person" within the meaning of 18 USC §1961 (3) and 1962 (c).

248.     At all times, the RICO Defendants were and are "persons" within the meaning of 18 USC § 1961 (3) and 1962 (c).

249.     The RICO Defendants are a group of persons associated together for a common purpose of engaging in a course of conduct (*i.e.* the scheme to defraud GRI and other lenders in connection with the sale of the 73 Unsold Units).

250.     On information and belief, and at all times relevant herein, the RICO Defendants had had a working relationship which continues to this day.

251.     The RICO Defendants agreed to the course of conduct described above.

252.     The RICO Defendants engaged in the activity described above in order to sell the Unsold Units at artificially inflated prices to unqualified straw buyers with funds provided by GRI and other similarly situated lenders.

253.     This association-in-fact was and is an "enterprise" within the meaning of RICO, 18 USC § 1961 (4).

254.     At all times, the RICO Defendants' enterprise was used to carry out the illegal fraudulent activities described in this complaint.

255.     At all times, the RICO Defendants' enterprise was engaged in and its activities affected interstate commerce within the meaning of RICO 18 USC § 1962 (c). As more fully described within this Complaint, the fraudulent scheme to defraud GRI and other similarly situated lenders affected interstate commerce.

256.     As more fully described within this Complaint, the RICO Defendants conducted or participated, directly and indirectly, in the conduct of the enterprise's affairs through a "pattern of racketeering activity," within the  meaning of RICO, 18 USC § 1962 (c).

257.     The pattern of racketeering engaged in by the RICO Defendants involved a scheme whereby the RICO Defendants used fraud and artifice to unlawfully obtain funds from GRI, a financial institution, and other lenders. The scheme to defraud resulted in the RICO Defendants receiving funds from GRI and other lenders to which they had no right and which they otherwise would not have obtained, but for the scheme.

258.     Each fraudulent listing, purchase and sale of the Unsold Units constitutes a separate violation of 18 USC § 1344, which prohibits knowingly executing or attempting to execute a scheme or artifice to defraud a financial institution or to obtain any of the moneys, funds, credits, assets, securities or other property owned by, under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations or promises. The acts of the RICO Defendants complained of herein constitute racketeering activity within the meaning of RICO, 18 USC § 1964 (5).

259.     As a direct and proximate result of the RICO Defendants violation of RICO, 18 USC § 1962 (c), GRI has suffered damages in excess of $600,000.00.

260.     In accord with RICO, 18 USC§ 1964 (c), GRI is entitled to recover treble damages plus its costs and attorneys' fees from the RICO Defendants.

**COUNT II**

**COMMON LAW FRAUD (BARR and 13th & STATE)**

1-244.  GRI re-alleges and incorporates by reference Paragraphs 1 through 244 of its Count I as and for Paragraphs 1 through 232 of this Count II as though fully stated herein.

245.     13th &State is named as a party to this claim for fraud based on its *respondeat superior* liability for the conduct of Barr which was performed within the scope of his employment and authority as agent for 13th&State.

246.    As alleged and set forth herein, and above, on or before December 2007, a scheme was developed to sell a number of Vision on State condominiums at inflated prices and thereby defraud mortgage lenders, including GRI.

247.    Barr concealed the information regarding payments to Aslam with the intent that GRI would rely on the misstatements and omissions in funding the loans for Kim, Rahman and Waseem.

248.    GRI relied upon the information and statements contained in the Kim Contract, Waseem Contract and Rahman Contract as well as the Kim HUD-1, Rahman HUD-1 and the Waseem HUD-1 when it funded the loans to Kim, Rahman and Waseem

249.    The Kim, Rahman and Waseem condominiums have all been foreclosed upon by the end investor to whom GRI sold the mortgage.

250.    As a direct and proximate result of the fraudulent misstatements and material omissions made by Barr, GRI funded three loans it would not have otherwise funded.

251.    As a direct and proximate result of the fraudulent misstatements and material omissions made by Barr, GRI has been damaged in excess of one million dollars.

252.    Barr's conduct and actions described herein were performed willfully, wantonly and maliciously, entitling GRI to an award of punitive damages.

### COUNT III

### COMMON LAW FRAUD (KIM)

1-244.  GRI restates and re-alleges Paragraphs 1 through 244 of its Count I as and for Paragraphs 1 through 244 of this Count III as though fully stated herein.

245.    Kim made the Kim Statements knowing that they were false.

246.     Kim made the Kim Statements with the intent that GRI rely on them and extend her a loan in connection with her purchase of Unsold Unit # 617.

247.     GRI reasonably relied on the Kim Statements contained in the loan application

248.     In reliance on the Kim Statements, GRI agreed to extend a loan to Kim in the amount of $373,000.00.

249.     Had GRI known that the Kim Statements were false, GRI would not have extended the loan to Kim.

250.     Following GRI's loan to Kim, Unsold Unit #617 has been foreclosed on.

251.     GRI, as a direct and proximate result of Kim's false and fraudulent statements, has suffered damages in the form of extending a loan to Kim in the amount of $373,000, incurring costs, and attorney's fees.

252.     Kim acted willfully, wantonly, maliciously and with the intent to defraud GRI.

## COUNT IV

## COMMON LAW FRAUD (RAHMAN)

1-244.  GRI restates and re-alleges Paragraphs 1 through 244 of its Count I as and for Paragraphs 1 through 244 of this Count IV.

245.     Rahman made the Rahman Statements knowing that they were false.

246.     Rahman made the Rahman Statements with the intent that GRI rely on them and extend him a loan in connection with his purchase of Unsold Unit # 1913.

247.     GRI reasonably relied on the Rahman Statements contained in the loan application

248.     In reliance on the Rahman Statements, GRI agreed to extend a loan to Rahman in the amount of $390,399.00.

249.     Had GRI known that the Rahman Statements were false, GRI would not have extended the loan to Rahman.

250.     Following GRI's loan to Rahman, Unsold Unit # 1913 has been foreclosed on.

251.     GRI, as a direct and proximate result of Rahman's false and fraudulent statements, has suffered damages in the form of extending a loan to Rahman in the amount of $390,399.00, incurring costs, and attorney's fees.

252.     Rahman acted willfully, wantonly, maliciously and with the intent to defraud GRI.

## COUNT V

## **COMMON LAW FRAUD (WASEEM)**

1-244.   GRI restates and re-alleges Paragraphs 1 through 244 of its Count I as and for Paragraphs 1 through 244 of this Count V.

245.     Waseem made the Waseem Statements knowing that they were false.

246.     Waseem made the Waseem Statements with the intent that GRI rely on them and extend him a loan in connection with his purchase of Unsold Unit # 701.

247.     GRI reasonably relied on the Waseem Statements contained in the loan application

248.     In reliance on the Waseem Statements, GRI agreed to extend a loan to Waseem in the amount of $394,200.00.

249.     Had GRI known that the Waseem Statements were false, GRI would not have extended the loan to Waseem.

250.     Following GRI's loan to Waseem, Unsold Unit # 701 has been foreclosed on.

251.    GRI, as a direct and proximate result of Waseem's false and fraudulent statements, has suffered damages in the form of extending a loan to Waseem in the amount of $394,200, incurring costs, and attorney's fees.

252.    Waseem acted willfully, wantonly, maliciously and with the intent to defraud GRI.

COUNT VI

COMMON LAW FRAUD (LUPESCU)

1-244. GRI restates and re-alleges Paragraphs 1 through 244 of its Count I as and for Paragraphs 1 through 244 of this Count VI.

**Lupescu Submits the Kim Loan Application
for Processing to GRI Knowing It Contains False Statements**

245.    On April 24, 2008, Lupescu executed the Kim Loan Application knowing the Kim Statements contained in the Kim Loan Application were false.

246.    Lupescu submitted the Kim Loan Application to GRI on April 24, 2008, with the intent that GRI rely on the statements in the Kim Loan Application, including the Kim Statements, and agree to fund the loan to Kim in connection with her purchase of Unsold Unit # 617.

247.    In reliance on Lupescu's execution and submission of the Kim Loan Application and attestation to the truth and accuracy of the representations in the Kim Loan Application, including the Kim Statements, GRI agreed to extend a loan to Kim for the purchase of Unsold Unit # 617 in the amount of $373,000.00.

248.    As a direct and proximate result of Lupescu's fraudulent statement that the information in the Kim Loan Application was true and accurate, GRI has suffered damages in the

42

form of extending a loan to Kim in the amount of $373,000 to purchase Unsold Unit # 617 which has since been foreclosed.

**Lupescu Submits the Rahman Loan Application**
**for Processing to GRI Knowing It Contains False Statements**

249.    On February 26, 2008, Lupescu executed the Rahman Loan Application knowing the Rahman Statements contained in the Rahman Loan Application were false.

250.    Lupescu submitted the Rahman Loan Application to GRI on February 26, 2008, with the intent that GRI rely on the statements in the Rahman Loan Application, including the Rahman Statements, and agree to fund the loan to Rahman in connection with his purchase of Unsold Unit # 1913.

251.    In reliance on Lupescu's execution of the Rahman Loan Application and attestation to the truth and accuracy of the representations in the Rahman Loan Application, including the Rahman Statements, GRI agreed to extend a loan to Rahman for the purchase of Unsold Unit # 1913 in the amount of $390,399.

252.    As a direct and proximate result of Lupescu's fraudulent statements that the information in the Rahman Loan Application was true and accurate, GRI has suffered damages in the form of extending a loan to Rahman in the amount of $390,399 to purchase Unsold Unit # 1913.

**Lupescu Submits the Waseem Loan Application**
**for Processing to GRI Knowing It Contains False Statements**

253.    On February 28, 2008, Lupescu executed the Waseem Loan Application knowing the Waseem Statements contained in the Kim Loan Application were false.

254.    Lupescu submitted the Waseem Loan Application to GRI on February 28, 2008, with the intent that GRI rely on the statements in the Waseem Loan Application, including the

Waseem Statements, and agree to fund the loan to Waseem in connection with his purchase of Unsold Unit # 701.

255.    In reliance on Lupescu's execution of the Waseem Loan Application and attestation to the truth and accuracy of the representations in the Waseem Loan Application, including the Waseem Statements, GRI agreed to extend a loan to Waseem for the purchase of Unsold Unit # 701 in the amount of $394,200.

256.    As a direct and proximate result of Lupescu's fraudulent statement to GRI that the information in the Waseem Loan Application was true and accurate, GRI has suffered damages in the form of extending a loan to Waseem in the amount of $394,200 to purchase Unsold Unit # 701 which has since been foreclosed.

257.    Lupescu acted willfully, wantonly, maliciously and with the intent to defraud GRI.

**COUNT VII**

**COMMON LAW FRAUD (JILEK and SOUTHWEST APPRAISAL)**

1-244.  GRI restates and re-alleges Paragraphs 1 through 244 of its Count I as and for Paragraphs 1 through 244 of this Count VII.

245.    Southwest Appraisal is named as a party to this claim for fraud based on its *respondeat superior* liability for the conduct of Jilek which was performed within the scope of his employment and authority as agent for Southwest Appraisal.

246.    Jilek prepared the appraisals for Unsold Unit #'s 617, 1913 and 701 with the intent that GRI rely on them in extending loans to Kim, Waseem and Rahman.

247.    Jilek knowing included false and fraudulent statements in the Unsold Unit Appraisals with the intent that GRI rely on each.

248.     GRI did rely on the Unsold Unit # 617 Appraisal in connection with extending a loan to Kim.

249.     GRI did rely on the Unsold Unit # 1913 Appraisal in connection with extending a loan to Rahman.

250.     GRI did rely on the Unsold Unit # 701 Appraisal in connection with extending a loan to Waseem.

251.     As a direct and proximate result of the false statements made by Jilek in the Unsold Unit # 617 Appraisal, GRI suffered damages in the form of extending a loan to Kim which it otherwise would not have.

252.     Since extending the loan to Kim, Unsold Unit # 617 has been foreclosed.

253.     As a direct and proximate result of the false statements made by Jilek in the Unsold Unit # 1913 Appraisal, GRI suffered damages in the form of extending a loan to Rahman which it otherwise would not have.

254.     Since extending the loan to Rahman, Unsold Unit # 1913 has been foreclosed.

255.     As a direct and proximate result of the false statements made by Jilek in the Unsold Unit # 701 Appraisal, GRI has suffered damages in the form of extending a loan to Waseem which it otherwise would not have.

256.     Since extending the loan to Waseem, Unsold Unit # 701 has been foreclosed.

257.     As a direct and proximate result of Jilek's fraudulent conduct, GRI has suffered damages in excess of $600,000.00

258.     Jilek acted willfully, wantonly and maliciously and with the intent to defraud GRI.

## COUNT VIII

## COMMON LAW FRAUD (LATTAS and the LATTAS FIRM)

1-244. GRI restates and re-alleges Paragraphs 1 through 244 of its Count I as and for Paragraphs 1 through 244 of this Count VIII.

245. The Lattas Firm is named as a party to this claim for fraud based on its *respondeat superior* liability for the conduct of Lattas which was performed within the scope of his employment and authority as agent for the Lattas Firm.

246. Lattas, as the attorney for the seller, 13th&State, was involved in the preparation of the Kim HUD-1, the Rahman HUD-1 and Waseem HUD-1. (Ex. 5, Kim HUD-1; Ex. 8, Rahman HUD-1; Ex. 11, Waseem HUD-1.)

247. Lattas knew that Aslam/Aslam Group was receiving a substantial fee in connection with the sales to Kim, Waseem and Rahman for recruiting each purchaser.

248. Lattas intentionally failed to disclose and include the fee being paid to Aslam/Aslam Group in the Kim HUD-1, the Rahman HUD-1 and the Waseem HUD-1.

249. Lattas executed the Kim HUD-1, the Waseem HUD-1 and the Rahman HUD-1 knowing that the fees being paid to Aslam/Aslam Group were not disclosed in each HUD-1 and knowing that each HUD-1 contained a false representation as to the total disbursements being made by the seller in each transaction because the fee being paid to Aslam/Aslam Group was not identified.

**Lattas Knowingly Prepares The Kim HUD-1**
**Without Disclosing The Fee To Aslam/Aslam Group**

250. Lattas' intentional concealment and omission of the fees being paid to Aslam/Aslam Group in connection with Kim's purchase of Unsold Unit # 617 was done with the intent that GRI rely on the statements in the Kim HUD-1 and fund the loan to Kim.

251.     In reliance on the Kim HUD-1 and Lattas' execution of the Kim HUD-1 which affirmed the accuracy of the statements contained therein, including that all of the disbursements being made by the seller in connection with the transaction had been disclosed, GRI funded Kim's purchase of Unsold Unit # 617. (Ex. 5, Kim HUD-1.)

252.     Had Lattas disclosed the fees being paid to Aslam/Aslam Group in connection wht the Kim purchase of Unsold Unit # 617, GRI would not have agreed to fund the loan to Kim.

253.     As a direct and proximate result of Lattas' false and fraudulent statements and omissions contained in the Kim HUD-1, GRI suffered damages in the form of extending a loan to Kim it otherwise would not have.

254.     Since the date the loan was extended to Kim, Unsold Unit # 617 has been foreclosed on.

**Lattas Knowingly Prepares The Rahman HUD-1**
**Without Disclosing The Fee To Aslam/Aslam Group**

255.     Lattas' intentional concealment and omission of the fees being paid to Aslam/Aslam Group in connection with Rahman's purchase of Unsold Unit # 1913 was done with the intent that GRI rely on the statements in the Rahman HUD-1 and fund the loan to Rahman.

256.     In reliance on the Rahman HUD-1 and Lattas' execution of the Rahman HUD-1 which affirmed the accuracy of the statements contained therein, including that all of the disbursements being made by the seller in connection with the transaction had been disclosed, GRI funded Rahman's purchase of Unsold Unit # 1913. (Ex. 8, Rahman HUD-1.)

257.     Had Lattas disclosed the fees being paid to Aslam/Aslam Group in connection with the Rahman purchase of Unsold Unit # 1913, GRI would not have agreed to fund the loan to Rahman.

47

258.    As a direct and proximate result of Lattas' false and fraudulent statements and omissions contained in the Rahman HUD-1, GRI suffered damages in the form of extending a loan to Rahman it otherwise would not have.

259.    Since the date the loan was extended to Rahman, Unsold Unit # 1913 has been foreclosed upon.

**Lattas Knowingly Prepares The Waseem HUD-1**
**Without Disclosing The Fee To Aslam/Aslam Group**

260.    Lattas' intentional concealment and omission of the fees being paid to Aslam/Aslam Group in connection with Waseem's purchase of Unsold Unit # 701 was done with the intent that GRI rely on the statements in the Waseem HUD-1 and fund the loan to Waseem.

261.    In reliance on the Waseem HUD-1 and Lattas' execution of the Waseem HUD-1 which affirmed the accuracy of the statements contained therein, including that all of the disbursements being made by the seller in connection with the transaction had been disclosed, GRI funded Waseem's purchase of Unsold Unit # 701. (Ex. 11, Waseem HUD-1.)

262.    Had Lattas disclosed the fees being paid to Aslam/Aslam Group in connection with the Waseem purchase of Unsold Unit # 701, GRI would not have agreed to fund the loan to Waseem.

263.    As a direct and proximate result of Lattas' false and fraudulent statements and omissions contained in the Waseem HUD-1, GRI suffered damages in the form of extending a loan to Waseem it otherwise would not have.

264.    Since the date the loan was extended to Waseem, Unsold Unit # 701 has been foreclosed on.

265.    As a direct and proximate result of Lattas' fraudulent conduct, GRI has suffered damages in excess of $600,000.00.

266.     Lattas acted willfully, wantonly and maliciously with the intent to defraud GRI.

## COUNT IX

**CONSPIRACY TO DEFRAUD (BARR, 13th&STATE, RENAISSANT DEVELOPMENT, RENAISSANT MANAGEMENT, RJE, R. BORKOWSKI, J. BORKOWSKI, E. BORKOWSKI, SAVA, GFI, ASLAM, ASLAM GROUP, LATTAS, the LATTAS FIRM, LUPESCU, DRUSKA, KIM, RAHMAN, WASEEM, JILEK, and SOUTHWEST APPRAISAL)**

1-244.  GRI restates an re-alleges Paragraphs 1 through 244 of its Count I as and for Paragraphs 1 through 244 of this Count IX.

245.     Defendants, Barr, 13th&State, Renaissant Development, Renaissant Management, RJE, R. Borkowski, J. Borkowski, E. Borkowski, Sava, GFI, Aslam, Aslam Group, Lattas, the Lattas Firm, Lupescu, Druska, Kim, Rahman, Waseem, Jilek, and Southwest Appraisal (the "Conspirator Defendants" agreed to a scheme to defraud GRI and other lenders as described more fully above.

246.     As more fully described above, the Conspirator Defendants entered into a scheme and conspiracy to defraud GRI in connection with the sale of Unsold Unit #'s 617, 1913 and 701 at the Vision on State Development.  The  Conspirator Defendants used the funds they misappropriated from GRI to fund down payments for the purchases, to pre-pay homeowner's association fees, to pre-pay mortgage payments and to pay Aslam/Aslam Group substantial fees in connection with his recruitment of borrowers willing to participate in the scheme to defraud GRI and other lenders.

247.     GFI is named as a party to this scheme and conspiracy to defraud based on its *respondeat superior* liability for the conduct of Sava which was performed within the scope of his employment and authority as an agent for GFI.

248.     Aslam Group is named as a party to this scheme and conspiracy to defraud based on its *respondeat superior* liability for the conduct of Aslam which was performed within the scope of his employment and authority as agent for Aslam Group.

249.     The Lattas Firm is named as a party to this scheme and conspiracy to defraud based on its *respondeat superior* liability for the conduct of Lattas which was performed within the scope of his employment and authority as agent for the Lattas Firm.

250.     Southwest Appraisal is named as a party to this scheme and conspiracy to defraud based on its *respondeat superior* liability for the conduct of Jilek which was performed within the scope of his employment and authority as agent for the Southwest Appraisal.

251.     13th&State is named as a party to this scheme and conspiracy to defraud based on its *respondeat superior* liability for the conduct of Barr which was performed within the scope of his employment and authority as agent for 13th&State.

252.     Renaissant Development is named as a party to this scheme and conspiracy to defraud based on its *respondeat superior* liability for the conduct of Barr which was performed within the scope of his employment and authority as agent for Renaissant Development.

253.     Renaissant Management is named as a party to this scheme and conspiracy to defraud based on its *respondeat superior* liability for the conduct of Barr which was performed within the scope of his employment and authority as agent for Renaissant Management.

254.     RJE is named as a part to this scheme and conspiracy to defraud based on its respondeat superior liability for the conduct of R. Borkowski, J. Borkowski and E. Borkowski which was performed within the scope of their employment and authority as agents for RJE.

255.     GRI, as a direct and proximate result of the misrepresentations, concealments and other fraudulent conduct of the Conspirator Defendants has been damaged in excess of $600,000.00

256.     The Conspirator Defendants personally or through their agents, acted willfully, wantonly, maliciously and with the intent to defraud GRI.

## COUNT X

## **BREACH OF CONTRACT (LUPESCU)**

1-244.  GRI repeats and re-alleges Paragraphs 1 through 244 of its Count I as and for Paragraphs 1 through 244 of this Count X.

245.     On or about July 6, 2007, GRI hired Lupescu as a Vice President of Mortgage Lending. (Ex. 13, Lupescu Employment Agreement).

246.     As a Vice President of Mortgage Lending at GRI, Lupescu's main job duties were to originate loans, collect borrower information, arrange appraisals, and ensure all information necessary for the loan to close was collected and was accurate.

247.     As the loan originator for the loans taken out by Kim, Rahman and Waseem, Lupescu was responsible for the collection of information from each borrower, including whether the borrower was going to reside in the unit they sought to purchase, as well as the collection of information concerning the borrower's assets, liabilities, income, down payment and other financial information.

248.     The Kim Statements, the Rahman Statements and the Waseem Statements contained in each borrower's respective loan application were false.

249.    Lupescu knew at the time he received the completed loan applications from Kim, Rahman and Waseem that the Kim Statements, the Rahman Statements and the Waseem Statements contained in each loan application were false.

250.    Despite his knowledge of the false statements in each loan application, Lupescu executed each loan application and certified the accuracy of the information contained within.

251.    Lupescu perpetuated the falsity of the Kim Statements, the Rahman Statements and the Waseem Statements by submitting them to GRI to obtain the GRI Loans.

252.    Lupescu breached the Lupescu Employment Agreement by knowingly submitting false information to GRI for approval of the GRI Loans.

253.    GRI has performed all of its obligations under the Lupescu Employment Agreement except those excused by Lupescu's breaches.

254.    As a direct and proximate result of Lupescu's breaches of the Lupescu Employment Agreement, GRI has suffered damages in excess of $600,000.00.

## COUNT XI

## BREACH OF FIDUCIARY DUTY (LUPESCU)

1-254.  GRI repeats and re-alleges paragraphs 1 through 254 of its Count X as and for Paragraphs 1 through 254 of this Count XI.

255.    In connection with and in furtherance of Lupescu's employment relationship with GRI, Lupescu was given access to clients of GRI and was the primary point of contact for clients seeking a loan from GRI.

256.    As an employee and officer of GRI, Lupescu owed GRI the fiduciary duties of loyalty, care and good faith and to act solely in the best interests of GRI.

257.     Lupescu owed GRI a duty not to act in a manner adverse or harmful to GRI and the duty to refrain from taking advantage of GRI through misrepresentations and concealments.

258.     Lupescu breached his fiduciary duties to GRI by:

    (a)    submitting the Kim Loan Application to GRI for approval with knowledge that it contained the false Kim Statements;

    (b)    submitting the Rahman Loan Application to GRI for approval with knowledge that it contained the false Rahman Statements; and

    (c)    submitting the Waseem Loan Application to GRI for approval with knowledge that it contained the false Waseem Statements;

    (d)    retaining Jilek/Southwest Aprraisal to prepare false appraisals for Unsold Unit #'s 617, 701 and 1913 in connection with the loans to Kim, Rahman, and Waseem.

259.     As a direct and proximate result of Lupescu's breaches of the fiduciary duties he owes to GRI, GRI has suffered damages in the form of funding loans to unqualified borrowers without adequate security as collateral.

260.     As a direct and proximate result of Lupescu's breaches of his fiduciary duties, GRI has suffered damages in excess of $600,000.00

261.     Lupescu acted willfully, wantonly, maliciously and with the intent to defraud GRI.

**COUNT XII**

**<u>BREACH OF CONTRACT (DRUSKA)</u>**

1-244.   GRI repeats and re-alleges Paragraphs 1 through 244 of its Count I as and for Paragraphs 1 through 244 of this Count XII as though fully stated herein.

245.     On or about May 9, 2007, GRI hired Druska as a mortgage consultant (Ex. 14, Druska Employment Agreement).

246.    As the mortgage consultant for Lupescu for the loans applied for by the Defendant Borrowers, Druska was also responsible for the collection of information concerning whether the borrower was going to reside in the units they sought to purchase, as well as the information concerning the borrower's assets, liabilities, income, down payment and other financial information.

247.    Druska knew at the time she received the completed loan applications from Kim, Rahman and Waseem that the Kim Statements, the Rahman Statements and the Waseem Statements contained in each loan application were false.

248.    Druska perpetuated the falsity of the Kim Statements, the Rahman Statements and the Waseem Statements by approving the information contained within as true and accurate and submitting each to GRI to obtain the GRI Loans.

249.    Druska breached the Druska Employment Agreement by knowingly submitting false information to GRI for approval of the GRI Loans.

250.    GRI has performed all of its obligations under the Druska Employment Agreement except those excused by Druska's breaches.

251.    As a direct and proximate result of Druska's breaches of the Druska Employment Agreement, GRI has suffered damages in excess of $600,000.00.

## COUNT XIII

## BREACH OF FIDUCIARY DUTY (DRUSKA)

1-251.  GRI repeats and re-alleges Paragraphs 1 through 251 of its Count XII as and for Paragraphs 1 through 251 of this Count XIII.

252.    As an employee of GRI, Druska owed GRI the fiduciary duties of loyalty, care and good faith and to act solely in the best interests of GRI.

54

253.     Druska owed GRI a duty not to act in a manner adverse or harmful to GRI and the duty to refrain from taking advantage of GRI through misrepresentations and concealments.

254.     Druska breached her fiduciary duties to GRI by:

(a)     submitting the Kim Loan Application to GRI for approval with knowledge that it contained the false Kim Statements;

(b)     submitting the Rahman Loan Application to GRI for approval with knowledge that it contained the false Rahman Statements;

(c)     submitting the Waseem Loan Application to GRI for approval with knowledge that it contained the false Waseem Statements; and

(d)     failing to inform GRI that the Kim Loan Application, Rahman Loan Application and Waseem Loan Application contained false material statements.

255.     As a direct and proximate result of Druska's breaches of the fiduciary duties she owes to GRI, GRI has suffered damages in the form of funding loans to unqualified borrowers without adequate security as collateral.

256.     As a direct and proximate result of Druska's breaches of the fiduciary duties she owed to GRI, GRI has suffered damages in excess of $600,000.00.

257.     Druska acted willfully, wantonly, maliciously and with the intent to defraud GRI.

## COUNT XIV

## NEGLIGENT MISREPRESENTATION (JILEK and SOUTHWEST APPRAISAL)

1-154.  GRI repeats and re-alleges Paragraphs 1 through 154 of its Count I as and for Paragraphs 1 through 154 of this Count XIV.

155.     Southwest Appraisal is named as a party to this claim for negligent misrepresentation based on its *respondeat superior* liability for the conduct of Jilek which was performed within the scope of his employment and authority as an agent for Southwest Appraisal.

156.    Jilek/Southwest Appraisal is in the business of supplying information (i.e. appraisals) which is used in connection with the purchase and sale of real estate, including condominiums.

**The Jilek Appraisal of Unsold Unit #617**

157.    On or about March 14, 2008, Jilek conducted an appraisal of Unsold Unit # 617 in connection with the GRI loan to Kim.

158.    Jilek owed a duty to GRI to provide an accurate and complete appraisal of Unsold Unit # 617.

159.    Jilek knew that the appraisal report he prepared regarding Unsold Unit # 617 would be relied upon by GRI in determining whether to extend a loan to Kim in connection with her purchase of Unsold Unit # 617.

160.    In connection with the appraisal of Unsold Unit # 617 Jilek prepared a written report dated March 14, 2008 (Ex. 15, Unsold Unit # 617 Appraisal, p. 3.)

161.    The Unsold Unit # 617 Appraisal was prepared by Jilek and contains the following statements made by Jilek:

(a)    During the twelve months prior to the effective date of this appraisal, Unsold Unit # 617 was listed for $376,548.00 for 249 days;

(b)    The Date of the Contract is:  07/11/2007;

(c)    No financial assistance (loan charges, sale concessions, gift or downpayment assistance, etc.) was paid by any party on behalf of the borrower; and

(d)    The appraised value of Unsold Unit # 617 is $438,000.00 as of 3/14/2008.

(Ex. 15, Unsold Unit # 617 Appraisal, pp. 1, 3).

162.    Jilek breached the duty he owed to GRI when he provided the Unsold Unit # 617 Appraisal because:

(a)     During the twelve months prior to the effective date of the Kim Appraisal (March 14, 2008), Unsold Unit # 617 was listed at the following prices on the following dates: (1) $343,700.00 from April 4, 2007 through April 11, 2007; and (2) $376,548.00 from April 11, 2007 through December 7, 2007;

(b)     The Kim Contract is not dated July 11, 2007, and was executed by Barr in or around January of 2008;

(c)     Kim received financial assistance, including a downpayment totaling $42,169.15, a credit for closing costs totaling $10,463.98, and two years of homeowner's association assessments paid by the seller totaling $12,639.84; and

(d)     A retrospective appraisal was performed on Unsold Unit #617 based on the identical information used by Jilek and the value of $438,000 was determined to be overstated by over $100,000. (the "Unsold Unit # 617 Retrospective Appraisal," attached hereto as Exhibit 21 and incorporated herein by reference).

163.    GRI, in connection with its decision to extend a loan to Kim for the purchase of Unsold Unit #617 relied on the statements made by Jilek in the Unsold Unit # 617 Appraisal.

164.    As a direct and proximate result of Jilek's negligent misrepresentations in the Unsold Unit #617 Appraisal and negligent misrepresentation of the true value of Unsold Unit # 617, GRI funded the loan to Kim in the amount of $373,000.

165.    As a direct and proximate result of Jilek's breach of the duty owed to GRI, GRI has suffered damages in the amount of $373,000, the total value of the loan extended to Kim for the purchase of Unsold Unit # 617.

**The Jilek Appraisal of Unsold Unit # 1913**

166.    On or about March 6, 2008, Jilek conducted an appraisal of Unsold Unit # 1913 in connection with the GRI loan to Rahman.

167.    Jilek owed a duty to GRI to provide an accurate and complete appraisal of Unsold Unit # 1913.

168.     Jilek knew that the appraisal report he prepared regarding Unsold Unit #1913 would be relied upon by GRI in determining whether to extend a loan to Rahman in connection with his purchase of Unsold Unit #1913.

169.     In connection with the appraisal of Unsold Unit # 1913, Jilek prepared a written report dated March 6, 2008 (Ex. 16, Unsold Unit # 1913 Appraisal, p. 3.)

170.     Jilek made the following statements in the Unsold Unit #1913 Appraisal which is dated February 27, 2008:

(a)     During the twelve months prior to the effective date of this appraisal, Unsold Unit # 1913 was listed for $433,777.00 for 270 days;

(b)     No financial assistance (loan charges, sale concessions, gift or downpayment assistance, etc.) was paid by any party on behalf of the borrower; and

(c)     The appraised value of Unsold Unit # 1913 is $434,000.00 as of 03/06/2008.

(Ex. 16, Unsold Unit # 1913 Appraisal, pp. 1, 3).

171.     Jilek breached the duty he owed to GRI when he provided the Unsold Unit # 1913 appraisal because:

(a)     During the twelve months prior to the effective date of the Unsold Unit #1913 Appraisal (March 6, 2008) Unsold Unit # 1913 was listed for $433,777.00 from January 18, 2008 through March 6, 2008;

(b)     Rahman received financial assistance, including a downpayment totaling $43,879.55, a credit for closing costs totaling $9,830.85, and two years of homeowner's association assessments paid by the seller totaling $11,418.48; and

(c)     A retroactive appraisal was performed on Unsold Unit # 1913 based on the identical information used by Jilek and the value of $434,000 was determined to be overstated by over $100,000. (the "Unsold Unit # 1913 Retroactive Appraisal," attached hereto as Exhibit 22 and incorporated herein by reference).

172.     GRI, in connection with its decision to extend a loan to Rahman for the purchase of Unsold Unit # 1913 relied on the statements made by Jilek in the Unsold Unit # 1913 Appraisal.

173.     As a direct and proximate result of Jilek's negligent misrepresentation of the true value of Unsold Unit # 1913, GRI funded the loan to Rahman in the amount of $390,399.

174.     As a direct and proximate result of Jilek's breach of the duty owed to GRI, GRI has suffered damages in the amount of $390,399, the total value of the loan extended to Rahman for the purchase of Unsold Unit # 1913.

**The Jilek Appraisal of Unsold Unit # 701**

175.     On or about February 27, 2008, Jilek conducted an appraisal of Unsold Unit # 701 in connection with the GRI loan to Waseem.

176.     Jilek owed a duty to GRI to provide an accurate and complete appraisal of Unsold Unit # 701.

177.     Jilek knew that the appraisal report he prepared regarding Unsold Unit # 701 would be relied upon by GRI in determining whether to extend a loan to Waseem in connection with his purchase of Unsold Unit # 701.

178.     In connection with the appraisal of Unsold Unit #701, Jilek prepared a written report dated February 27, 2008 (Ex. 17, Unsold Unit #701 Appraisal, p. 3.)

179.     Jilek made the following statements in the Unsold Unit #701 Appraisal which is dated February 27, 2008:

> (a)     During the twelve months prior to the effective date of this appraisal, Unsold Unit # 701 was listed for $422,372.00 for 425 days;
>
> (b)     No financial assistance (loan charges, sale concessions, gift or downpayment assistance, etc.) was paid by any party on behalf of the borrower; and

    (c)    The appraised value of Unsold Unit # 701 is $438,000.00 as of 02/27/2008.

(Ex. 17, Unsold Unit # 701 Appraisal, pp. 1, 3).

180.    Jilek breached the duty he owed to GRI when he provided the Unsold Unit # 701 Appraisal because:

    (a)    During the twelve months prior to the effective date of the Unsold Unit # 701 Appraisal (February 27, 2008) Unsold Unit # 701 was listed at the following prices on the following dates:  (1) $306,900.00 from November 8, 2006 through March 23, 2007; (2) $390,540 from April 4, 2007 through December 7, 2007; and (3) $422,372.00 from January 18, 2008 through February 27, 2008;

    (b)    Waseem received financial assistance, including a downpayment totaling $44,310.19, a credit for closing costs totaling $9,813.33, and two years of homeowner's association assessments paid by the seller totaling $11,617.44; and

    (c)    A retrospective appraisal was performed on Unsold Unit #701 based on the identical information used by Jilek and the value of $438,000 was determined to be overstated by over $100,000. (the "Unsold Unit # 701 Retrospective Appraisal," attached hereto as Exhibit 23 and incorporated herein by reference).

181.    GRI, in connection with its decision to extend a loan to Waseem for the purchase of Unsold Unit # 701 relied on the statements made by Jilek in the Unsold Unit #701 Appraisal.

182.    As a direct and proximate of Jilek's breaches of the duties he owed to GRI to perform the appraisals of Unsold Units 617, 701 and 1913, with care, GRI has suffered damages in excess of $600,000.00.

## COUNT XV

## BREACH OF CONTRACT (SOUTHWEST APPRAISAL-UNSOLD UNIT # 617)

1-154.  GRI repeats and re-alleges Paragraphs 1 through 154 of its Count XIV as and for Paragraphs 1 through 154 of this Count XV.

155.    On or about March 14, 2008, GRI and Southwest Appraisal entered into a contract whereby Southwest agreed to perform appraisal services for GRI in connection with GRI's funding of a loan to Kim for the purchase of Unsold Unit #617 in exchange for payment of $200.00.

156.    On March 14, 2008, Southwest Appraisal prepared the Unsold Unit # 617 Appraisal and provided it to GRI.

157.    The Unsold Unit # 617 Appraisal was prepared by Southwest and contains the following inaccurate statements:

(a)    During the twelve months prior to the effective date of this appraisal, Unsold Unit # 617 was listed for $376,548.00 for 249 days;

(b)    The Date of the Contract is:  07/11/2007;

(c)    No financial assistance (loan charges, sale concessions, gift or downpayment assistance, etc.) was paid by any party on behalf of the borrower; and

(d)    The appraised value of Unsold Unit # 617 is $438,000.00 as of 3/14/2008.

(Ex. 15, Unsold Unit # 617 Appraisal, pp. 1, 3).

158.    Southwest Appraisal breached its contract with GRI when it provided deficient and defective Unsold Unit # 617 Appraisal because:

(a)    During the twelve months prior to the effective date of the Kim Appraisal (March 14, 2008), Unsold Unit # 617 was listed at the following prices on the following dates:  (1) $343,700.00 from April 4, 2007 through April 11, 2007; and (2) $376,548.00 from April 11, 2007 through December 7, 2007;

(b)    The Kim Contract is not dated July 11, 2007, and was executed by Barr in or around January of 2008;

(c)    Kim received financial assistance, including a downpayment totaling $42,169.15, a credit for closing costs totaling $10,463.98, and two years of homeowner's association assessments paid by the seller totaling $12,639.84; and

(d)     A retrospective appraisal was performed on Unsold Unit #617 based on the identical information used by Jilek and the value of $438,000 was determined to be overstated by over $100,000. (Ex. 21, Unsold Unit # 617 Retrospective Appraisal.)

159.    GRI performed all of its obligations under the contract.

160.    As a direct and proximate result of Southwest Appraisal's breaches of the contract, GRI has been damaged by extending a loan secured by collateral that was overvalued by Southwest Appraisal leaving GRI undersecured.

161.    As a direct and proximate result of Southwest Appraisal's breaches of the contract, GRI has suffered damages in the form of extending a loan to Kim for the purchase of Unsold Unit # 617 in the amount of $373,000.

## COUNT XVI

## **BREACH OF CONTRACT (SOUTHWEST APPRAISAL –UNSOLD UNIT # 1913)**

1-154.  GRI repeats and re-alleges Paragraphs 1 through 154 of its Count XIV as and for Paragraphs 1 through 154 of this Count XVI.

155.    On or about March 6, 2008, GRI and Southwest Appraisal entered into a contract whereby Southwest Appraisal agreed to perform appraisal services for GRI in connection with GRI's funding of a loan to Rahman for the purchase of Unsold Unit #1913 in exchange for payment of $200.00.

156.    On March 6, 2008, Southwest Appraisal prepared the Unsold Unit #1913 Appraisal and provided it to GRI.

157.    The Unsold Unit # 1913 Appraisal was prepared by Southwest Appraisal and contains the following inaccurate statements:

    (a)    During the twelve months prior to the effective date of this appraisal, Unsold Unit # 1913 was listed for $433,777.00 for 270 days;

    (b)    No financial assistance (loan charges, sale concessions, gift or downpayment assistance, etc.) was paid by any party on behalf of the borrower; and

    (c)    The appraised value of Unsold Unit # 1913 is $434,000.00 as of 03/06/2008.

(Ex. 16, Unsold Unit # 1913 Appraisal, pp. 1, 3).

158.    Southwest Appraisal breached its contract with GRI when it provided the deficient and defective Unsold Unit # 1913 Appraisal because:

    (a)    During the twelve months prior to the effective date of the Unsold Unit #1913 Appraisal (March 6, 2008) Unsold Unit # 1913 was listed for $433,777.00 from January 18, 2008 through March 6, 2008;

    (b)    Rahman received financial assistance, including a downpayment totaling $43,879.55, a credit for closing costs totaling $9,830.85, and two years of homeowner's association assessments paid by the seller totaling $11,418.48; and

    (c)    A retroactive appraisal was performed on Unsold Unit # 1913 based on the identical information used by Jilek and the value of $434,000 was determined to be overstated by over $100,000. (Ex. 22, Unsold Unit # 1913 Retrospective Appraisal.)

159.    GRI performed all of its obligations under the contract.

160.    As a direct and proximate result of Southwest Appraisal's breaches of the contract, GRI has been damaged by extending a loan secured by collateral that was overvalued by Southwest Appraisal leaving GRI undersecured.

161.     As a direct and proximate result of Southwest Appraisal's breaches of the contract, GRI has suffered damages in the form of extending a loan to Rahman for the purchase of Unsold Unit # 1913 in the amount of $390,399.

## COUNT XVII

## BREACH OF CONTRACT (SOUTHWEST APPRAISAL-UNSOLD UNIT # 701)

1-154.  GRI repeats and re-alleges Paragraphs 1 through 154 of its Count XIV as and for Paragraphs 1 through 154 of this Count XVII.

155.     On or about February 27, 2008, GRI and Southwest Appraisal entered into a contract whereby Southwest Appraisal agreed to perform appraisal services for GRI in connection with GRI's funding of a loan to Waseem for the purchase of Unsold Unit #701 in exchange for payment of $200.00.

156.     On February 27, 2008, Southwest Appraisal prepared the Unsold Unit #701 Appraisal and provided it to GRI.

157.     The Unsold Unit # 701 Appraisal was prepared by Southwest Appraisal and contains the following inaccurate statements:

(a)     During the twelve months prior to the effective date of this appraisal, Unsold Unit # 701 was listed for $422,372.00 for 425 days;

(b)     No financial assistance (loan charges, sale concessions, gift or downpayment assistance, etc.) was paid by any party on behalf of the borrower; and

(c)     The appraised value of Unsold Unit # 701 is $438,000.00 as of 02/27/2008.

(Ex. 17, Unsold Unit # 701 Appraisal, pp. 1, 3).

158.     Southwest Appraisal breached its contract with GRI when it provided the

deficient and defective Unsold Unit # 701 Appraisal because:

(a)     During the twelve months prior to the effective date of the Unsold Unit # 701 Appraisal (February 27, 2008) Unsold Unit # 701 was listed at the following prices on the following dates:  (1) $306,900.00 from November 8, 2006 through March 23, 2007; (2) $390,540 from April 4, 2007 through December 7, 2007; and (3) $422,372.00 from January 18, 2008 through February 27, 2008;

(b)     Waseem received financial assistance, including a downpayment totaling $44,310.19, a credit for closing costs totaling $9,813.33, and two years of homeowner's association assessments paid by the seller totaling $11,617.44; and

(c)     A retrospective appraisal was performed on Unsold Unit #701 based on the identical information used by Jilek and the value of $438,000 was determined to be overstated by over $100,000. (Ex. 23,Unsold Unit # 701 Retrospective Appraisal.)

159.     GRI performed all of its obligations under the contract.

160.     As a direct and proximate result of Southwest Appraisal's breaches of the

contract, GRI has been damaged by extending a loan secured by collateral that was overvalued

by Southwest Appraisal leaving GRI undersecured.

161.     As a direct and proximate result of Southwest Appraisal's breaches of the

contract, GRI has suffered damages in the form of extending a loan to Waseem for the purchase

of Unsold Unit # 701 in the amount of $394,200.

## COUNT XVIII

## <u>NEGLIGENCE (JILEK and SOUTHWEST APPRAISAL)</u>

1-154.  GRI repeats and re-alleges Paragraphs 1 through 154 of its Count I as and for

Paragraphs 1 through 154 of this Count XVIII.

155.     Southwest Appraisal is named as a party to this claim for negligence based on its *respondeat superior* liability for the conduct of Jilek which was performed within the scope of his employment and authority as an agent for Southwest Appraisal.

**Jilek Negligently Appraises Unsold Unit #617**

156.     On or about March 14, 2008, Jilek conducted an appraisal of Unsold Unit # 617 in connection with the GRI loan to Kim.

157.     Jilek owed a duty to GRI to provide an accurate and complete appraisal of Unsold Unit # 617.

158.     Jilek knew that the appraisal report he prepared regarding Unsold Unit # 617 would be relied upon by GRI in determining whether to extend a loan to Kim in connection with her purchase of Unsold Unit # 617.

159.     In connection with the appraisal of Unsold Unit #617 Jilek prepared a written report dated March 14, 2008 (Ex. 15, Unsold Unit #617 Appraisal, p. 3.)

160.     The Unsold Unit # 617 Appraisal was prepared by Jilek and contains the following statements made by Jilek:

> (a)     During the twelve months prior to the effective date of this appraisal, Unsold Unit # 617 was listed for $376,548.00 for 249 days;
>
> (b)     The Date of the Contract is:  07/11/2007;
>
> (c)     No financial assistance (loan charges, sale concessions, gift or downpayment assistance, etc.) was paid by any party on behalf of the borrower; and
>
> (d)     The appraised value of Unsold Unit # 617 is $438,000.00 as of 3/14/2008.

(Ex. 15, Unsold Unit # 617 Appraisal, pp. 1, 3.)

161.     152.     Jilek breached the duty he owed to GRI when he provided the Unsold Unit # 617 Appraisal because:

      (a)     During the twelve months prior to the effective date of the Kim Appraisal (March 14, 2008), Unsold Unit # 617 was listed at the following prices on the following dates:  (1) $343,700.00 from April 4, 2007 through April 11, 2007; and (2) $376,548.00 from April 11, 2007 through December 7, 2007;

      (b)     The Kim Contract is not dated July 11, 2007, and was executed by Barr in or around January of 2008;

      (c)     Kim received financial assistance, including a downpayment totaling $42,169.15, a credit for closing costs totaling $10,463.98, and two years of homeowner's association assessments paid by the seller totaling $12,639.84; and

      (d)     A retrospective appraisal was performed on Unsold Unit #617 based on the identical information used by Jilek and the value of $438,000 was determined to be overstated by over $100,000. (Ex. 21, Unsold Unit # 617 Retrospective Appraisal.)

162.    GRI, in connection with its decision to extend a loan to Kim for the purchase of Unsold Unit #617 relied on Jilek to properly prepare the Unsold Unit # 617 Appraisal .

163.    As a direct and proximate result of Jilek's negligence and breach of the duty he owed to GRI, GRI funded the loan to Kim in the amount of $373,000.

164.    As a direct and proximate result of Jilek's breach of the duty owed to GRI, GRI has suffered damages in the amount of $373,000, the total value of the loan extended to Kim for the purchase of Unsold Unit # 617.

**Jilek Negligently Appraises Unsold Unit # 1913**

165.    On or about March 6, 2008, Jilek conducted an appraisal of Unsold Unit # 1913 in connection with the GRI loan to Rahman.

166.    Jilek owed a duty to GRI to provide an accurate and complete appraisal of Unsold Unit # 1913.

167.    Jilek knew that the appraisal report he prepared regarding Unsold Unit #1913 would be relied upon by GRI in determining whether to extend a loan to Rahman in connection with his purchase of Unsold Unit #1913.

168.    In connection with the appraisal of Unsold Unit # 1913, Jilek prepared a written report dated March 6, 2008 (Ex. 16, Unsold Unit # 1913 Appraisal, p. 3.)

169.    Jilek made the following statements in the Unsold Unit #1913 Appraisal which is dated February 27, 2008:

      (a)    During the twelve months prior to the effective date of this appraisal, Unsold Unit # 1913 was listed for $433,777.00 for 270 days;

      (b)    No financial assistance (loan charges, sale concessions, gift or downpayment assistance, etc.) was paid by any party on behalf of the borrower; and

      (c)    The appraised value of Unsold Unit # 1913 is $434,000.00 as of 03/06/2008.

(Ex. 16, Unsold Unit # 1913 Appraisal, pp. 1, 3).

170.    Jilek breached the duty he owed to GRI when he provided the Unsold Unit # 1913 appraisal because:

      (a)    During the twelve months prior to the effective date of the Unsold Unit #1913 Appraisal (March 6, 2008) Unsold Unit # 1913 was listed for $433,777.00 from January 18, 2008 through March 6, 2008;

      (b)    Rahman received financial assistance, including a downpayment totaling $43,879.55, a credit for closing costs totaling $9,830.85, and two years of homeowner's association assessments paid by the seller totaling $11,418.48; and

      (c)    A retroactive appraisal was performed on Unsold Unit # 1913 based on the identical information used by Jilek and the value of $434,000 was determined to be overstated by over $100,000. (Ex. 22, Unsold Unit # 1913 Retrospective Appraisal.)

171.     GRI, relied on Jilek to properly prepare the Unsold Unit # 617 Appraisal relied on Jilek to properly prepare the Unsold Unit # 1913 Appraisal in connection with its decision to extend a loan to Rahman for the purchase of Unsold Unit # 1913

172.     As a direct and proximate result of Jilek's negligence and breach of the duty he owed to GRI, GRI funded the loan to Rahman in the amount of $390,399.

173.     As a direct and proximate result of Jilek's breach of the duty owed to GRI, GRI has suffered damages in the amount of $390,399, the total value of the loan extended to Rahman for the purchase of Unsold Unit # 1913.

**Jilek Negligently Appraises Unsold Unit # 701**

174.     On or about February 27, 2008, Jilek conducted an appraisal of Unsold Unit # 701 in connection with the GRI loan to Waseem.

175.     Jilek owed a duty to GRI to provide an accurate and complete appraisal of Unsold Unit # 701.

176.     Jilek knew that the appraisal report he prepared regarding Unsold Unit # 701 would be relied upon by GRI in determining whether to extend a loan to Waseem in connection with his purchase of Unsold Unit # 701.

177.     In connection with the appraisal of Unsold Unit #701, Jilek prepared a written report dated February 27, 2008 (Ex. 17, Unsold Unit #701 Appraisal, p. 3.)

178.     Jilek made the following statements in the Unsold Unit #701 Appraisal which is dated February 27, 2008:

(a)     During the twelve months prior to the effective date of this appraisal, Unsold Unit # 701 was listed for $422,372.00 for 425 days;

(b)     No financial assistance (loan charges, sale concessions, gift or downpayment assistance, etc.) was paid by any party on behalf of the borrower; and

      (c)      The appraised value of Unsold Unit # 701 is $438,000.00 as of 02/27/2008.

(Ex. 17, Unsold Unit # 701 Appraisal, pp. 1, 3).

179.    Jilek breached the duty he owed to GRI when he provided the Unsold Unit # 701

Appraisal because:

      (a)      During the twelve months prior to the effective date of the Unsold Unit # 701 Appraisal (February 27, 2008) Unsold Unit # 701 was listed at the following prices on the following dates: (1) $306,900.00 from November 8, 2006 through March 23, 2007; (2) $390,540 from April 4, 2007 through December 7, 2007; and (3) $422,372.00 from January 18, 2008 through February 27, 2008;

      (b)      Waseem received financial assistance, including a downpayment totaling $44,310.19, a credit for closing costs totaling $9,813.33, and two years of homeowner's association assessments paid by the seller totaling $11,617.44; and

      (c)      A retrospective appraisal was performed on Unsold Unit #701 based on the identical information used by Jilek and the value of $438,000 was determined to be overstated by over $100,000. (Ex. 23, Unsold Unit # 701 Retrospective Appraisal.)

180.    GRI, in connection with its decision to extend a loan to Waseem for the purchase

of Unsold Unit # 701 relied on the statements made by Jilek in the Unsold Unit #701 Appraisal.

181.    As a direct and proximate result of Jilek's negligence and breach of the duty he

owed to GRI, GRI funded the loan to Waseem in the amount of $394,200.

182.    As a direct and proximate result of Jilek's breach of the duty owed to GRI, GRI

has suffered damages in the amount of $394,200, the total value of the loan extended to Waseem

for the purchase of Unsold Unit # 701.

183.    As a direct and proximate of Jilek's breaches of the duties he owed to GRI to

perform the appraisals of Unsold Units 617, 1913 and 701, GRI has suffered damages in excess

of $600,000.00.

## COUNT XIX

## <u>NEGLIGENCE (CAGALA and STEWART TITLE)</u>

1-244.  GRI restates and re-alleges Paragraphs 1 through 244 of its Count I as and for

Paragraphs 1 through 244 of this Count XIX.

245.    Stewart Title is named as a party to this claim for negligence based on its

*respondeat superior* liability for the conduct of Cagala which was performed within the scope of

her employment and authority as an agent for Stewart Title.

246.    Cagala acted as closing agent at each of the closings for loans funded by GRI and

prepared, reviewed and submitted documents to GRI for mortgage loans obtained by Kim,

Waseem and Rahman.

247.    Cagala and Stewart owed duties to GRI to provide GRI with truthful information

and to act with reasonable care to ensure that the information contained in the documents,

prepared, reviewed and submitted by them to GRI was true and correct.

**Cagala Notarizes Multiple Occupancy and Financial Status**
**Affidavits For Kim Each of Which Declares**
**<u>the Unsold Unit Being Purchased Will Be A Principal Residence</u>**

248.    On May 2, 2008, Cagala acted as the closing agent for Kim's purchase of Unsold

Unit 617 and Unsold Unit # 717.

249.    At each closing on May 2, 2008, Cagala notarized an Occupancy and Financial

Status Affidavit executed by Mrs. Kim which stated that each unit, Unsold Unit #617 and Unsold

Unit #717 would be used as the primary residence for Mrs. Kim. (Ex. 6, Kim Occupancy Aff.)

250.    Cagala breached the duty of care she owed GRI by notarizing the two inconsistent

Occupancy and Financial Status Affidavits and by submitting the Kim Occupancy Affidavit to

GRI.

**Cagala Notarizes Multiple Occupancy and Financial Status**
**Affidavits For Rahman Each of Which Declares**
**the Unsold Unit Being Purchased Will Be A Principal Residence**

251.    On March 13, 2008, Cagala acted as the closing agent for Rahman's purchase of

Unsold Unit

252.    At the closing on March 13, 2008, Rahman executed an Occupancy and Financial

Status Affidavit and swore that, within 60 days of the closing date, he would occupy Unsold Unit

# 1913 as his principal residence and would continue to do so for a period of one year (Ex. 9,

Rahman Occupancy Aff.)

253.    Cagala notarized the Rahman Occupancy Affidavit.

254.    On April 8, 2008, less than one month after Rahman purchased Unsold Unit

#1913 with a loan from GRI, Rahman purchased Unsold Unit # 1813 with a loan from another

lender.

255.    Cagala acted as the closing agent when Rahman purchased Unsold Unit # 1813.

256.    At the closing of Unsold Unit # 1813, Cagala notarized an Occupancy and

Financial Status Affidavit by Rahman which stated that Rahman would occupy Unsold Unit #

1813 as his principal residence and would continue to do so for a period of one year.

257.    Cagala breached the duty of care she owed to GRI when she notarized the

Occupancy and Financial Status Affidavit in connection with the closing of Unsold Unit # 1813

after she had submitted the Rahman Occupancy Affidavit to GRI because Rahman could not own

two separate units and occupy them both as principal residences.

**Cagala Notarizes Multiple Occupancy and Financial Status
Affidavits For Waseem Each of Which Declares
the Unsold Unit Being Purchased Will Be A Primary Residence**

258.    On February 28, 2008, just two weeks before his purchase of Unsold Unit # 701, Waseem's wife, Samaira Waseem, purchased Unsold Unit # 1914 as a primary residence.

259.    Waseem and his wife, Samaira were and are at all times relevant herein married and living together.

260.    In connection with Samaira Waseem's purchase of Unsold Unit # 1914, Samaira Waseem executed an Occupancy and Financial Status Affidavit, declaring that Unsold Unit # 1914 would be occupied by her as her principal residence for a period of one year.

261.    Cagala acted as the closing agent at the closing of Unsold Unit # 701.

262.    Cagala notarized Samaira Waseem's Occupancy and Financial Status Affidavit in connection with the purchase of Unsold Unit # 1914.

263.    On March 13, 2008, at the closing of Unsold Unit # 701, Waseem executed an Occupancy and Financial Status Affidavit and swore that, within 60 days of the closing date, he would occupy Unsold Unit # 701 as his principal residence and would continue to do so for a period of one year (Ex. 12, Waseem Occupancy Aff.)

264.    Cagala notarized the Waseem Occupancy Affidavit.

265.    Cagala breached the duty of care she owed to GRI when she notarized the Occupancy and Financial Status Affidavit in connection with the closing of Unsold Unit # 701 because Rahman and his wife could not own two separate units and occupy them both as principal residences.

73

266.    Through the negligent acts or the omissions of Cagala and Stewart, including their failure to act with reasonable care GRI made loans they would not have otherwise, and but for such negligence of Cagala and Stewart, GRI would not have made such loans.

267.    As a direct and proximate result of Cagala's negligence, GRI has suffered damages in excess of $600,000.00.

## JURY DEMAND

268.    GRI requests a trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure.

**WHEREFORE**, Plaintiff, Guaranteed Rate, Inc. respectfully requests the following relief:

A.    For a judgment of compensatory damages against Warren Barr, Anthony Lupescu, 13th&State, LLC, Renaissant Development Group, LLC, Renaissant Management Group, Inc., Richard Borkowski, John Borkowski, Edward Borkowski, RJE Investments, LLC, Jim Carroll, Vasile Sava, Global Financing Investments Corp., Asif Aslam, Aslam Group, Inc., Jeffrey Budzik, Budzik & Dynia, LLC, Tracy Cagala, Stewart Title Guaranty Company, Robert Lattas, Lattas Law, LLC a/k/a the Law Offices of Robert D. Lattas, Hyun Sook Kim, Abdur Rahman, Iqbal Waseem, Michelle Druska, Robert J. Jilek, and Southwest Appraisal & Consulting, Inc., jointly and severally, in such amount as may be determined by the proofs to be the amount of losses sustained by Guaranteed Rate, Inc.

B.    For an award of treble damages pursuant to 18 U.S.C. § 1964 (c) against Warren Barr, 13th&State, LLC, Renaissant Development Group, LLC, Renaissant Management, Inc., RJE Investments, LLC, Richard Borkowski, John Borkowski, Edward Borkowski, Asif Aslam, Aslam Group, Robert Lattas, Lattas Law, LLC a/k/a the Law Offices of Robert D. Lattas, jointly

and severally, in such amount established by the proofs based upon each defendant's conduct and his or its respective net worth;

        C.      For an award of punitive damages in such amount as established by the proofs based upon each defendant's conduct and his or its respective net worth;

        D.      For an award of Guaranteed Rate, Inc.'s reasonable attorneys' fees; and

        E.      For such other and additional relief as this Court may deem just and proper

LOUIS CHRONOWSKI
SEYFARTH SHAW LLP
131 South Dearborn Street, Suite 2400
Chicago, Illinois 60603
(312) 460-5891


CHARLES I. BACHTELL
CLAYTON HUTCHINSON
RICHARD J. CUNNINGHAM
GUARANTEED RATE, INC.
3940 N. Ravenswood
Chicago, IL 60613
(773) 290-0352

Respectfully Submitted,

GUARANTEED RATE, INC.


By: /s/ Richard J. Cunningham
     One of Its Attorneys