IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| GUARANTEED RATE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| WARREN BARR, ANTHONY LUPESCO, 13TH & | ) | No. 12 C 5362 |
| STATE, LLC, RENAISSANT DEVELOPMENT | ) | |
| GROUP, LLC, RENAISSANT MANAGEMENT | ) | Judge Virginia M. Kendall |
| GROUP, INC., RICHARD BORKOWSKI, JOHN | ) | |
| BORKOWSKI, EDWARD BORKOWSKI, RJE | ) | |
| INVESTMENTS, LLC, JIM CARROL, VASILE SAVA, | ) | |
| GLOBAL FINANCING INVESTMENTS, CORP., ASIF | ) | |
| ASLAM, ASLAM GROUP, INC, JEFFERY BUDZIK, | ) | |
| BUDZIK & DYNIA, LLC, TRACY CAGALA, | ) | |
| STEWART TITLE GUARANTY COMPANY, | ) | |
| ROBERT LATTAS, LATTAS LAW, LLC, a/k/a the | ) | |
| LAW OFFICES OF ROBERT D. LATTAS, HYUN | ) | |
| SOOK KIM, ABDUR RAHMAN, IQBAL WASEEM, | ) | |
| MICHELLE DRUSKA, ROBERT J. JILEK and | ) | |
| SOUTHWEST APPRAISAL & CONSULTING, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Guaranteed Rate, Inc. ("Guaranteed Rate") filed this suit against twenty-six

individuals and entities (collectively "Defendants"), alleging that Defendants conspired to defraud

Guaranteed Rate in connection with the sale of real estate at a condominium development in

Chicago, Illinois, known as Vision on State ("the Development"). Specifically, Guaranteed Rate

alleges Defendants artificially inflated sale prices of units in the Development, recruited straw buyers

to fraudulently obtain financing from Guaranteed Rate, provided the straw buyers' down payments,

and hired a real estate appraiser to prepare materially inaccurate appraisals as part of a scheme to

eliminate the personal liability of several defendants under personal guaranties executed in connection with the construction loan used to finance the Development.

Defendants Robert D. Lattas and Lattas Law, LLC d/b/a Law Office of Robert D. Lattas (collectively "Lattas") served as counsel for Defendant 13th & State, LLC ("13th & State"), the seller of the condominium units in the Development. Defendants RJE Investments, LLC, Richard Borkowski, John Borkowski, and Edward Borkowski (collectively "the RJE Defendants") are members of 13th & State. Defendant Warren Barr ("Barr") is a real estate developer in Illinois and owner of entity Defendants Renaissant Development Group, LLC, and Renaissant Management Group, Inc. (collectively "Renaissant"). Lattas and the RJE Defendants move separately to dismiss Count I of Guaranteed Rate's Amended Complaint. Additionally, Barr moves to set aside the Order of Default entered against him on October 30, 2012,[1] and various Defendants, including Lattas and the RJE Defendants, move to dismiss the state law claims asserted against them.[2] For the reasons stated below, Lattas and the RJE Defendants' Motions to Dismiss Count I are granted, and Count I of Guaranteed Rate's Amended Complaint is dismissed in its entirety. As Count I represents the sole basis for this Court's federal jurisdiction, the Court relinquishes jurisdiction over the remaining state law claims asserted in Counts II through XX of the Amended Complaint. The Court chooses

---

[1] Although Barr's Motion is titled, "Motion for Leave to Appear, *Vacate* Default and for Extension of Time to Answer," which suggests Barr is moving under Rule 60(b) to have a default judgment vacated, the substantive arguments in the Motion make clear that Barr is in fact moving under Rule 55(c) to set aside the Court's entry of an Order of Default. Additionally, Barr has attached a Motion to Dismiss to his Reply Brief in support of his Motion to Vacate. (Dkt. No. 131 Ex. 2.) However, Barr's Motion to Dismiss is not properly before the Court at this time because the Order of Default entered against Barr has not been vacated or set aside.

[2] Specifically, Defendant Barr moves to dismiss Count II and IX; Defendant Hyun Soon Kim moves to dismiss Counts III and IX; Defendant Lupescu moves to dismiss Counts VI, IX, X, and XI; Defendant Lattas moves to dismiss Count VIII and IX; the RJE Defendants move to dismiss Count IX; Defendants Stewart Title Guaranty Company and Tracy Cagala move to dismiss Count XIX; Defendants Jeffrey Budzik and Budzik & Dynia, LLC move to dismiss the Amended Complaint in its entirety and separately argue for the dismissal of Counts IX and XX; and Defendants Robert J. Jilek and Southwest Appraisal and Consulting, Inc. move to dismiss the Amended Complaint in its entirety.

to not exercise its supplemental jurisdiction over the remaining state law claims and therefore the motions to dismiss state law claims are therefore denied for lack of jurisdiction, and Guaranteed Rate's Amended Complaint is dismissed in its entirety and must be brought in the state court. Barr's motion to set aside the Court's Order of Default is also granted.

## **STATEMENT OF FACTS**

The following facts are taken from Guaranteed Rate's Amended Complaint and are assumed to be true for the purposes of this Motion to Dismiss. *See Voelker v. Porsche Cars North America, Inc.*, 353 F.3d 516, 520 (7th Cir. 2003). All reasonable inferences are drawn in favor of Guaranteed Rate, the non-moving party. *See Killingsworth v. HSBC Bank*, 507 F.3d 614, 618 (7th Cir. 2007) (citing *Savory v. Lyons*, 469 F.3d 667, 670 (7th Cir. 2006)).

### I.     **The Development**

On or about September 30, 2005, Defendant 13th & State, LLC ("13th & State") obtained a construction loan ("the Loan") in the amount of $55,725,130 from IndyMac Bank, F.S.B. ("the Bank") to construct the Vision on State Development at 1255 S. State Street in Chicago, Illinois. (Pl. Am. Complaint, ¶ 33.) Defendants Warren Barr, Jim Carrol, Richard Borkowski, John Borkowski, and Edward Borkowski (collectively, "the Guarantor Defendants") each executed a personal guaranty in favor of the Bank as security for the Loan. (*Id.* ¶ 34.) As of November 30, 2007, 180 residential units in the Development had been sold or were under contract. (*Id.* ¶ 37.) Seventy-three units remained unsold ("the Unsold Units"), leaving the Guarantor Defendants exposed to millions of dollars in personal liability. (*Id.*)

## II.    The Alleged Scheme

In November of 2007, the Guarantor Defendants, Lattas, and Defendant Asif Aslam ("Aslam") devised a scheme to sell Unsold Units in the Development by recruiting straw buyers to purchase the units at artificially inflated prices (*Id.* ¶¶ 39–40.)  The excess revenue generated by selling the Unsold Units was to be funneled to Aslam and Defendant Aslam Group, Inc. ("Aslam Group"), and used to provide illegal incentives for the would-be buyers, including supplying the buyers' down payments, mortgage payments, and homeowner's association assessments. (*Id.* ¶¶ 41–42.)

In early December of 2007, the Guarantor Defendants approached Defendants Global Financing Investments, Corp., and its owner, Vasile Sava (collectively, "GFI"), to have the Unsold Units relisted at inflated prices predetermined by the Guarantor Defendants and Aslam. (*Id.* ¶ 46.) On December 9, 2007, GFI, at the direction of and in cooperation with the Guarantor Defendants, Aslam, and Lattas, delisted the 73 Unsold Units from the Multiple Listing Service ("the MLS"), a service used by real estate professionals to market properties for sale. (*Id.* ¶ 47.)  In January of 2008, the Guarantor Defendants caused 13th & State to enter a contract with Aslam Group, wherein Aslam agreed to recruit straw buyers to purchase the Unsold Units at inflated prices. (*Id.* ¶ 49.)  Barr and Aslam discussed the scheme with Defendants Anthony Lupescu ("Lupescu"), Jeffrey Budzik ("Budzik"), and Lattas, at various meetings in January and February of 2008. (*Id.* ¶¶ 50–52.)  On or about January 18, 2008, GFI relisted the Unsold Units on the MLS at the prices set by the Guarantor Defendants. (*Id.* ¶ 53.)  Defendant Robert J. Jilek ("Jilek"), an employee of Southwest Appraisal & Consulting, Inc., ("Southwest Appraisal"), provided materially inaccurate appraisals for the Unsold Units. (*Id.* ¶ 59.)

### III.    Guaranteed Rate's Loans

Guaranteed Rate funded the purchase of three Unsold Units in the Development, Unit #'s 617, 1913, and 701. (*Id.* ¶ 57.)  These units were sold to Defendants Hyun Sook Kim ("Kim") (Unit # 617), Abdur Rahman ("Rahman") (Unit # 1913), and Iqbal Waseem ("Waseem") (Unit # 701) (collectively, "the Buyers") (*Id.* ¶¶ 65, 91, 115.)  Lupescu, Guaranteed Rate's Vice President of Mortgage Lending, was responsible for collecting information concerning whether the Buyers were going to reside in the units they sought to purchase, as well as information concerning the Buyers' assets, liabilities, income, down payments, and other financial information. (*Id.* ¶¶ 144, 147.) Lupescu was also responsible for originating the loans, collecting borrower information, arranging appraisals, and ensuring all information necessary for the loans was accurate. (*Id.* ¶¶ 144–45.) Defendant Michelle Druska ("Druska"), whom Guaranteed Rate hired as a mortgage consultant, was responsible for insuring the information collected by Lupescu was true and accurate. (*Id.* ¶¶ 146–48.)

Guaranteed Rate also relied on Lupescu to retain a licensed appraiser to determine whether the properties being purchased by the Buyers were adequate collateral to secure its loans. (*Id.* ¶¶ 156–57.)  Lupescu retained Jilek of Southwest Appraisal to conduct an appraisal and provide an appraisal report for each Unsold Unit sold to the Buyers. (*Id.* ¶ 158.)  In furtherance of the conspiracy and scheme to defraud Guaranteed Rate, Lupescu and Jilek agreed that Jilek's appraisal reports for Unsold Unit #'s 617, 1913, and 701 would reflect appraised values equal to or slightly higher than the purchase prices identified in the purchase contracts for those units. (*Id.* ¶¶ 158–59.)  Jilek conducted appraisals of Unsold Unit #'s 701, 1913, and 617 on February 28, March 6, March 14, 2008, respectively. (*Id.* ¶¶ 160, 170, 179.)  For each appraisal, Jilek prepared a written appraisal report containing false statements and misrepresentations that induced Guaranteed Rate into lending

to the Buyers. (*Id.* ¶¶ 161, 164, 171, 174, 180, 183.) Guaranteed Rate alleges Jilek was aware the statements contained within his appraisal reports were false and that Jilek intended for Guaranteed Rate to rely on them. (*Id.* ¶¶ 168, 177, 186.)

In January, 2008, 13th & State, by and through its agent and alter ego, Warren Barr, executed sales contracts on Unsold Unit #'s 617, 1913, and 701. (*Id.* ¶¶ 188, 193, 195, 197.) In each instance, Barr was aware the Buyers had not provided $1,000 in earnest money in accordance with the contracts. (*Id.* ¶ 192.) After the loans were funded, 13th & State and Barr provided Aslam and Aslam Group with fees totaling $226,793.12 in connection with the sale of Unsold Unit #'s 617, 701, and 1913. (*Id.* ¶ 211.) 13th & State concealed the payment of these fees by intentionally failing to disclose them in the Buyers' HUD-1 Settlement Statements ("the HUD-1 Forms"). (*Id.* ¶ 212.) Guaranteed Rate relied on the statements contained within the sales contracts and the HUD-1 Forms when it extended loans to the Buyers. (*Id.* ¶¶ 203, 213.)

## IV.    The Buyers' Misrepresentations at Closing

The closings for Waseem's purchase of Unsold Unit # 701 and Rahman's purchase of Unsold Unit # 1913 occurred on March 13, 2008 (*Id.* ¶¶ 102, 126) The closing for Kim's purchase of Unsold Unit # 617 took place on May 2, 2008. (*Id.* ¶ 82.) The Buyers represented in their loan applications that the units would be occupied as principal residences and that they would provide a 10% down payment toward their purchase. (*Id.* ¶¶ 70, 95, 119.) Also, at their respective closings, the Buyers executed Occupancy and Financial Status Affidavits ("the Occupancy Affidavits") swearing that within 60 days of the closing date, they would occupy the purchased unit as their principal residences and would continue to do so for a period of one year. (*Id.* ¶¶ 82, 108, 136.) Based on these representations, Guaranteed Rate structured its loans to the Buyers as if they were

for the purchase of principal residences. (*Id.* ¶ 60.) However, unbeknownst to Guaranteed Rate, the Buyers also purchased other Unsold Units in the Development during the same general time period with funds provided by other lenders. On March 12, 2008, one day before the closing for Unit # 701, Waseem purchased two other Unsold Units in the Development, Unsold Unit #'s 1906 and 1908. (*Id.* ¶¶ 139–40, 142.) Two weeks prior, on February 28, 2008, Waseem's wife purchased Unsold Unit # 1914, and indicated, as Waseem had with respect to Unsold Unit # 701, that the unit would be used as a principal residence. (*Id.* ¶ 131.) On April 8, 2008, less than one month after closing on Unsold Unit # 1913, Rahman purchased Unit # 1813 with a loan from another lender and represented to that lender that the unit would be used as his principal residence. (*Id.* ¶ 110.) On the same day Kim purchased Unsold Unit # 617, he also purchased Unsold Unit # 717 with a loan from another lender. (*Id.* ¶ 85.) The Buyers did not disclose these transactions to Guaranteed Rate, and, despite their representations, never occupied Unit #'s 617, 1913 and 701 as principal residences, (*Id.* ¶¶ 84–85, 107, 110, 138, 141, 143), nor did they provide a 10% down payment at closing (*Id.* ¶¶ 80, 104, 129.) Instead, Budzik, the attorney representing the Buyers, obtained a cashier's check from Aslam equal to the amount of the down payments and brought them to each closing. (*Id.* ¶¶ 81, 106, 130.) Guaranteed Rate alleges Lupescu and Druska knew at the time they received completed loan applications from the Buyers that the statements contained in those applications were false. (*Id.* ¶¶ 150–51.) Despite this knowledge, Lupescu executed each loan application, certified the accuracy of the information contained therein, and submitted the applications to Guaranteed Rate for approval. (*Id.* ¶ 152.)

The closings for the purchases of Unsold Unit #'s 617, 717, 1813, 1913, and 1914 took place at the office of Stewart Title. (*Id.* ¶¶ 77, 87, 103, 126, 134.) Cagala, a Stewart Title employee, acted

as the closing agent on each purchase (*Id.* ¶¶ 78, 87, 103, 127, 134.)  With respect to Unsold Units # 617, 1913, and 701, Cagala also notarized each purchaser's Occupancy Affidavit. (*Id.* ¶¶ 83, 109, 137.)  Lattas appeared at each closing on behalf of the seller, 13th & State. (*Id.* ¶¶ 216, 226, 236), and executed the HUD-1 Forms for the Buyers. (*Id.* ¶¶ 220, 231, 240.)  Guaranteed Rate alleges Lattas knew that all disbursements made by 13th & State, including those made to Aslam and Aslam Group, had not been identified in the HUD-1 Forms. (*Id.* ¶¶ 221–23, 231–33, 241–43.)

Since the dates the loans were extended to the Buyers, Unsold Unit #'s 617, 1913, and 701 have been foreclosed upon. (*Id.* ¶¶ 254, 259, 264.)

## STANDARD OF REVIEW

When considering a motion to dismiss under Rule 12(b)(6), the Court accepts as true all facts alleged in the complaint and construes all reasonable inferences in favor of the plaintiff. *Killingsworth*, 507 F.3d at 618 (citing *Savory*, 469 F.3d at 670); *accord Murphy v. Walker*, 51 F.3d 714, 717 (7th Cir. 1995).  To state a claim upon which relief can be granted, a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2).  "Detailed factual allegations" are not required, but the plaintiff must allege facts that, when "accepted as true . . . 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  To determine whether a complaint meets this standard, the "reviewing court [must] draw on its judicial experience and common sense." *Id.*  When there are well-pleaded factual allegations, the Court assumes their veracity and determines if they plausibly give rise to an entitlement to relief. *Id.* at 679.  A claim has facial plausibility when the pleaded factual content allows the Court to draw a reasonable inference that the defendant is liable for the misconduct alleged. *See Id.* at 678.

## DISCUSSION

Count I of Guaranteed Rate's Amended Complaint alleges that Lattas, the Guarantor Defendants, 13th & State, Renaissant, Aslam, and Aslam Group (collectively, "the RICO Defendants"), associated for the purpose of engaging in a scheme to defraud Guaranteed Rate and other lenders in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et. seq, and specifically, 18 U.S.C. § 1962(c). (*Id.*, Count I, ¶¶ 246, 249.)[3] According to Guaranteed Rate, the RICO Defendants' association-in-fact was an enterprise within the meaning of RICO, and was formed to sell the Unsold Units at artificially inflated prices to unqualified straw buyers with funds provided by Guaranteed Rate and other similarly situated lenders. (*Id.*, Count I, ¶¶ 252–53.)

Lattas and the RJE Defendants move separately to dismiss Counts I of Guaranteed Rate's Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). According to these Defendants, Guaranteed Rate's Amended Complaint does not state a cause of action under RICO because Guaranteed Rate has failed to (1) file a timely complaint within the statute of limitations period,[4] (2) plead its claim with sufficient particularity, (3) plead facts demonstrating the existence of a RICO enterprise, and (4) establish a pattern of racketeering activity. Various defendants, including Lattas and the RJE Defendants also move to dismiss the state law claims asserted against them. However, because the RICO claim is the sole basis for this Court's jurisdiction, Count I will be addressed first. *See Doe–2 v. McLean County Unit Dist. No. 5 Bd. of Directors*, 593 F.3d 507,

---

[3]Guaranteed Rate has pleaded its Amended Complaint by count, with numbered paragraphs beginning again at the start of each new Count. Therefore, cites to paragraphs in the Amended Complaint that appear under specific counts include the number of the Count as well as the number of the relevant paragraph.

[4]Only the RJE Defendants have moved to dismiss based on the statute of limitations. Lattas does not address the issue in its Motion.

513 (7th Cir. 2010) ("[W]hen a district court dismisses the federal claim conferring original jurisdiction ... it relinquishes supplemental jurisdiction over any state-law claims under 28 U.S.C. § 1367(c)(3).").

The Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968 makes it unlawful "to conduct" an "enterprise's affairs through a pattern of racketeering activity," where "racketeering" is defined as behavior that violates certain enumerated federal statutes or state laws addressing specific topics and bearing specific penalties. 18 U.S.C. §§ 1962(c); 1961(1). RICO is a "unique cause of action that is concerned with eradicating organized, long-term, habitual criminal activity." *Gamboa v. Velez*, 457 F.3d 703, 705 (7th Cir. 2006). When Congress enacted RICO, it chose to supplement criminal enforcement of its provision by providing that "[a]ny person injured in his business or property" by a RICO violation may seek treble damages and attorney's fees. 18 U.S.C. § 1964(c); *Goren v. New Vision Intern., Inc.*, 156 F.3d 721, 726 (7th Cir. 1998). While Congress never intended RICO to be employed to allow plaintiffs to turn garden-variety state law fraud cases into RICO claims, *Jennings v. Auto Meter Products, Inc.*, 495 F. 3d 466, 472 (7th Cir. 2006), the breadth of RICO's text and lure of treble damages and attorney's fees have proven irresistible to plaintiff's bent on federalizing such claims. *See Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 499, n.16 (1985) (citing ABA Task Force study finding that only 9% of RICO claims involve "allegations of criminal activity of a type generally associated with professional criminals"); *see also Gamboa*, 457 F.3d at 710 ("Civil RICO plaintiffs persist in trying to fit a square peg in a round hole by squeezing garden-variety business disputes into civil RICO actions. While it is clear that the scope of civil RICO extends beyond the prototypical mobster or organized crime syndicate, it is equally evident that RICO has not federalized every state common law cause of action available

10

to remedy business deals gone sour.") (quoting *Midwest Grinding Co., Inc. v. Spitz*, 976 F.2d 1016, 1025 (7th Cir. 1992)). While there are significant substantive differences among the various RICO provisions contained in § 1962, the existence of an "enterprise" and a "pattern of racketeering" are elements that are fundamental to each subsection. 18 U.S.C. § 1962. Accordingly, to state a claim for a RICO violation, a plaintiff must allege a cognizable injury to its business or property resulting from the "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima*, 473 U.S. at 496; *Gamboa*, 457 F.3d at 705.

## I.     Statute of Limitations

RICO does not provide an express statute of limitations for actions brought under its civil enforcement provision. However, the Supreme Court has held that civil RICO claims should be governed by the same four-year statute of limitations period that governs closely related claims under the Clayton Act. *See Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 150–56 (1987) (analyzing the statutory relationship and legislative history of 18 U.S.C. § 1964 and the Clayton Act, 15 U.S.C. § 15); *Cancer Found., Inc. v. Cerberus Capital Mgmt., LP*, 559 F.3d 671, 674 (7th Cir. 2009) ("The statute of limitations for a civil RICO cause of action is a fairly generous four years.").

The statute of limitations is an affirmative defense, *see* Fed.R.Civ.P. 8(c), and need not be addressed by Guaranteed Rate in its Amended Complaint. *See U.S. Gypsum Co. v. Indiana Gas Co., Inc.*, 350 F.3d 623, 626 (7th Cir. 2003); *see also United States v. N. Trust Co.*, 372 F.3d 886, 888 (7th Cir. 2004) ("[A] complaint states a claim on which relief may be granted whether or not some defense is potentially available."). Therefore, complaints need not anticipate defenses, and the resolution of the statute of limitations comes after the complaint stage. *See N. Trust Co.*, 372 F.3d

at 888 (citing *Gomez v. Toledo*, 446 U.S. 635 (1980)). This general rule is subject to an important exception: the statute of limitations issue may be resolved definitely on the face of the complaint when the plaintiff pleads too much and admits definitively that the applicable limitations period has expired. *See id*; *Gypsum*, 350 F. 3d at 626 ("A litigant may plead itself out of court by alleging (and thus admitting) the ingredients of a defense ...."). Therefore, this Court must determine whether Guaranteed Rate has pleaded itself out of court based on the allegations in its Amended Complaint.

## A.    The Predicate Acts

A plaintiff's RICO claim does not accrue until after the alleged defendants have engaged in a "pattern of racketeering" activity. *McCool v. Strata Oil Co.*, 972 F.2d 1452, 1465 (7th Cir. 1992) ("There must, of course, be a pattern of racketeering before the plaintiff's RICO claim accrues, and this requirement might delay accrual until after the plaintiff discovers her injury."). Therefore, the RICO statute of limitations begins to accrue when both a "pattern of racketeering"–i.e. two predicate acts–has occurred, and when the plaintiff knows or should know he or she was injured. The Court views the allegations in the Amended Complaint in the light most favorable to Guaranteed Rate and accepts for the purposes of this analysis that each alleged predicate act is plead with sufficient particularity and would indeed support Guaranteed Rate's allegation of a predicate act of "racketeering" under RICO. Also, as discussed in more detail below, in order to state a viable civil RICO claim, a plaintiff must, in addition to establishing two predicate acts, satisfy the "continuity plus relationship" test by demonstrating that the racketeering predicates are related to one another and pose a threat of continued criminal activity. *See* Section IV; *Gamboa*, 457 F.3d at 706. However, the Court will not delve into the continuity analysis for the purpose of determining the point at which two predicate acts occurred to make Guaranteed Rate's underlying RICO claim

legally actionable. *See e.g., Zalesiak v. UnumProvident Corp.*, No. 06 C 4433, 2007 WL 4365345, at *4–5 (N.D. Ill. Dec. 12, 2007) (determining predicate acts for statute of limitations purposes without assessing whether the first two predicate acts would be sufficient to satisfy either the open- or closed-ended continuity analyses); *Limestone Development Corp. v. Village of Lemont*, 473 F.Supp.2d 858, 868–69 (N.D. Ill. 2007) *aff'd ,* 520 F.3d 797 (7th Cir. 2008) (same).

Guaranteed Rate alleges the RICO Defendants committed predicate acts between December 9, 2007 and May 2, 2008. The first predicate act alleged in the Amended Complaint against the RICO Defendants occurred on December 9, 2007, when, according to Guaranteed Rate, Lattas, Aslam, and the Guarantor Defendants directed GFI to relist the Unsold Units in the Development at inflated prices. (Am. Complaint, ¶¶ 46–47.) Guaranteed Rate alleges that a second predicate act occurred on January 8, 2008, when the Guarantor Defendants caused 13th & State to enter into a contract with Aslam Group, wherein Aslam agreed to recruit straw buyers for the Unsold Units at sales prices identified in a fee schedule created by the Guarantor Defendants. (*Id.* ¶ 49.) Therefore, for the purposes of this analysis, a pattern of racketeering activity existed as early as January 8, 2008. For the sake of argument, the very latest a pattern of racketeering existed was May 2, 2008, the date of Kim's closing on Unsold Unit # 617. Therefore, barring the effect of equitable tolling and the discovery rule, Guaranteed Rate had until January 9, 2012, or May 2, 2012 at the latest, to file its RICO claim. Guaranteed Rate filed its original Complaint in federal court on July 9, 2012, six months after the second predicate act and two months after the final closing date.

### B.    Guaranteed Rate's Alleged Injury

However, the four year statute of limitations for civil RICO claims does not begin to run until a plaintiff knows or should have known he was injured. *Barry Aviation Inc. v. Land O'Lakes Mun.*

*Airport Comm'n*, 377 F.3d 682, 688 (7th Cir. 2004); *McCool*, 972 F.2d at 1464; *see also Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 186–87 (1997) (rejecting "last predicate act" rule for determining accrual). This rule applies even where the plaintiff has not yet discovered the pattern. *See Rotella v. Wood*, 528 U.S. 549, 554 n.2, 555 (2000) (rejecting "last predicate act" rule and "injury and pattern discovery rule")

Based on the allegations in the Amended Complaint, the Court finds that Guaranteed Rate neither knew nor could have known of the alleged injury until at least after the closing dates for the Unsold Units. Guaranteed Rate could not have known the RICO Defendants were working behind the scenes with GFI to delist the Unsold Units from the MLS and reslist them at inflated prices, that the appraisal reports it received from Jilek were the product of a scheme between Lupescu and Jilek to fraudulently appraise the Unsold Units at values consistent with the inflated prices on the MLS, or that Aslam was receiving a substantial fee on the back-end for recruiting Waseem, Rahman, and Kim as buyers. Even as late as the closing dates in March and May of 2008, it is unclear from the Amended Complaint how Guaranteed Rate could have known it was being duped into lending funds based on false representations.

The RJE Defendants maintain that knowledge of the alleged fraud is imputed to Guaranteed Rate based on the fact that Lupescu and Druska were allegedly aware that the completed loan applications received from the Buyers contained false information. The law does not support that position. While knowledge obtained by corporate employees acting within the scope of their employment is imputed to the corporation, "the common law treats the principal as ignorant of facts known to an agent acting adversely to the principal, and for his own benefit." *Ash v. Georgia-Pac. Corp.*, 957 F.2d 432, 436 (7th Cir. 1992); *see also Northern Assur. Co. of America v. Summers*, 17

F.3d 956, 964–65 (7th Cir. 1994) (it is "well established that there is an exception to the construction or imputation of notice from the agent to the principal" where the agent's conduct "raises a clear presumption that he would not communicate the fact in controversy, as where the communication of such a fact would necessarily prevent the consummation of a fraudulent scheme which the agent was engaged in perpetrating, or when the person claiming the benefit of the knowledge ... collude with the agent to cheat or defraud the principal").

Here, Guaranteed Rate's factual allegations regarding Druska and Lupescu demonstrate they were, at the very least, complicit in the scheme to obtain mortgages for the sale of Unsold Units at inflated prices. Druska and Lupescu's alleged participation in the scheme raises a clear presumption that they would not have informed Guaranteed Rate that the statements made by the Buyers in their loan applications were false. Such communication would almost certainly have caused Guaranteed Rate to terminate its dealings with the Buyers, thereby preventing the consummation of the scheme. Accordingly, Lupescu and Druska's knowledge of the alleged scheme did not place Guaranteed Rate on notice for the purposes of the discovery rule. While it may be possible for the RICO Defendants to prove by way of an affirmative defense that Guaranteed Rate knew or should have known of its alleged injury within four years of the second alleged predicate act, the Court finds the situation presented here is not one where the plaintiff has "pleaded itself out of court" based on the allegations in its complaint. Therefore, dismissal for failure to file a complaint within the statute of limitations period is not appropriate at this stage in the proceedings.

## II.    Guaranteed Rate has Pleaded its RICO Claims with Sufficient Particularity

Allegations of fraud in a civil RICO complaint are subject to Rule 9(b)'s heightened pleading standard, which requires a plaintiff to plead all averments of fraud with particularity. Fed.R.Civ.P.

15

9(b); *see Goren*, 156 F.3d at 726. "While dismissal of a RICO claim is appropriate if the plaintiff fails to allege sufficient facts to state a claim that is plausible on its face, the adequate number of facts varies depending on the complexity of the case." *Kaye v. D'Amato*, 357 Fed.App'x 706, 710 (7th Cir. 2009). Strict adherence to the particularity requirement is especially important in a case such as this where the predicate fraud allegations provide the only link to federal jurisdiction. *See e.g., R.E. Davis Chemical Corp. v. Nalco Chemical Co.*, 757 F.Supp. 1499, 1516 (N.D. Ill. 1990) (Aspen, J.). To plead with particularity means to allege "the who, what, when, where, and how" of the alleged fraud. *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 569 (7th Cir. 2012) (quoting *Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Financing Svc's, Inc.*, 536 F.3d 663, 668 (7th Cir. 2008)).

In alleging a RICO pattern, liability is limited to persons who have "personally committed" at least two predicate acts of racketeering. *See Dudley Enterprises, Inc. v. Palmer Corp.*, 822 F.Supp. 496, 502 (N.D. Ill. 1993). Accordingly, Guaranteed Rate must, at a minimum, describe two predicate acts of fraud by each RICO Defendant with some specificity and state the time, place, and content of the alleged communications perpetrating the fraud, the method by which the misrepresentations were communicated, and the identities of the parties to those misrepresentations. *See Slaney v. The Int'l Amateur Athletic Federation*, 244 F.3d 580, 597 (7th Cir. 2001); *Lachmund v. ADM Investor Services, Inc.*, 191 F.3d 777, 784 (7th Cir. 1999); *see also Ray v. Karris*, 780 F.2d 636, 644–45 (7th Cir. 1985) ("A complaint is not sufficient if it does not specify the nature of the predicate acts to a degree that will allow the defendants to comprehend the specific acts to which they are required to answer."). This degree of specificity is made necessary in part by RICO's requirement that the predicate acts of racketeering be ongoing over an identified period of time so

16

that they can fairly be viewed as constituted separate transactions. *See, e.g., R.E. Davis*, 757 F. Supp. at 1516. In other words, without an adequately detailed description of the predicate acts, a complaint cannot provide either the defendants or the court with sufficient information to determine whether or not a pattern of racketeering activity has been established. *See id.* Where, as here, the plaintiff brings RICO claims against multiple defendants, the plaintiff must "plead sufficient facts to notify each defendant of his alleged participation in the scheme." *Id.* (citing *Vicom, Inc. v. Harbridge Merchant Svc's, Inc.*, 20 F.3d 771, 778 (7th Cir. 1994)).

Guaranteed Rate's Amended Complaint alleges three predicate acts with the level of particularity required in a civil RICO claim. Specifically, Guaranteed Rate alleges that on three separate occasions, Lattas appeared at real estate closings on behalf of 13th & State and executed the Buyers' HUD-1 Forms knowing those forms did not reflect disbursements made by 13th & State to Aslam and Aslam Group. (Am. Complaint., ¶¶ 220–23, 230–33, 240–43.) The Amended Complaint specifies the date, place, content, and method of communication for each alleged misrepresentation. Guaranteed Rate also identifies the respective buyers, Lattas, and Guaranteed Rate as parties to the alleged misrepresentations. Accordingly, the Court finds that Count I of Guaranteed Rates Amended Complaint meets Rule 9(b)'s heightened pleading requirement.

However, Guaranteed Rate's remaining allegations concerning Lattas are not pleaded with the requisite level of particularity. Guaranteed Rate alleges Lattas engaged with Aslam and the Guarantor Defendants to devise a scheme to sell the remaining Unsold Units in the Development to straw buyers at artificially inflated prices. (*Id.* ¶¶ 38, 40.) While the Amended Complaint places Lattas at various meetings with the other RICO Defendants, (*Id.* ¶¶ 38, 50), Guaranteed Rate fails to identify any details related to the meetings that would inform Lattas, or this Court, of what was

communicated at these meetings or the exact nature of Lattas's participation. Guaranteed Rate also alleges that GFI delisted the Unsold Units from the MLS "at the direction of, and in cooperation with" Lattas, Aslam, and the Guarantor Defendants. (*Id.* ¶ 47.) This alleged cooperation is significant to Guaranteed Rate's claims because it directly links several defendants, including Lattas, to the relisting of the Unsold Units at inflated prices. Yet the only factual detail related to this allegation in Guaranteed Rate's Amended Complaint is the date GFI took the Unsold Units off of the MLS. (*Id.*) The pleadings lump Lattas and six other defendants together without stating how, when, where, and to what extent each is alleged to have worked with GFI. RICO claims against multiple defendants must "plead sufficient facts to notify each defendant of his alleged participation in the scheme," *Goren*, 156 F.3d at 726 (citing *Vicom*, 20 F.3d at 778), and pleadings that simply attribute allegations to defendants as a single group are insufficient to meet the heightened pleading standard of Rule 9(b). *See, e.g., Whitley v. Taylor Bean & Whitacker Mortgage Corp.*, 607 F.Supp. 885, 898 (N.D. Ill. 2009) (Castillo, J.). Here, not only does Guaranteed Rate's Amended Complaint fail to allege the time, place, manner, or contents of a communication between Lattas and GFI, it does not allege any specific communication involving Lattas at all. This does not pass muster under Rule 9(b). Lastly, Guaranteed Rate alleges, "[o]n information and belief, and at all times relevant herein, the RICO Defendants had a working relationship which continues to this day." (Am. Complaint, ¶ 250.) Such conclusory allegations are insufficient. *Uni*Quality, Inc. v. Infotronx, Inc.*, 974 F.2d 918, 923–24 (7th Cir. 1992) (allegations made "upon information and belief" are generally insufficient). Even where facts are inaccessible to the plaintiff, the plaintiff must, at a minimum, state the grounds for its suspicions. *See Uni*Quality*, 974 F.2d at 924 (citing *Bankers Trust Co. v. Old Republic Ins. Co.*, 959 F.2d 677, 684 (7th Cir. 1992); *see also Leaf, Inc. v. Burdeen*, No. 95 C

5959, 1996 WL 89070, at *7 (N.D. Ill. Feb. 28, 1996) ("[M]ere assertion of 'information and belief,' absent the allegation of specific facts upon which that information and belief is founded, is insufficient to satisfy the requirements of Rule 9(b).") Because Guaranteed Rate has failed to allege any grounds for its belief that the RICO Defendants continue to maintain a working relationship with one another, the Court finds these allegations inadequately plead.

The foregoing deficiencies notwithstanding, however, Guaranteed Rate has alleged three predicate acts of fraud against Lattas with sufficient particularity. Accordingly, the Court finds that Count I of Guaranteed Rates Complaint comports with Rule 9(b)'s heightened pleading standard.

### III.  Guaranteed Rate has Failed to Plead Facts Establishing a RICO Enterprise

The "first rule" of pleading a RICO claim is that the "plaintiff's must identify an enterprise." *Jennings v. Emry*, 910 F.2d 1434, 1439–40 (7th Cir. 1990). A RICO enterprise is more than just a group of people who get together to commit a pattern of racketeering activity. *Richmond v. Nationwide Cassel L.P.*, 52 F.3d 640, 644 (7th Cir. 1995). RICO defines "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). The statutory language, therefore, allows for causes of action against both formal legal entities and informal associations-in-fact. *Jennings*, 910 F.2d at 1440. In this case, Guaranteed Rate alleges the RICO Defendants comprised an informal association-in-fact, which the Supreme Court has defined as "a group of persons associated together for a common purpose of engaging in a course of conduct." *Boyle v. United States*, 556 U.S. 938, 946 (2009) (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)).

In *Boyle*, the United States Supreme Court defined a RICO enterprise broadly, effectively rejecting efforts by many courts to implant additional structural features into the "enterprise" requirement, such as "structural hierarchy, role differentiation, a unique modus operandi, a chain of command, professionalism and sophistication of organization, diversity and complexity of crimes, membership dues, regulations, uncharged or additional crimes aside from predicate acts, an internal discipline mechanism, regular meetings regarding enterprise affairs, an enterprise names, [and] induction or initiation ceremonies and rituals." *Id.* at 948; *compare Limestone Development Corp. v. Village of Lemont, Ill.*, 520 F.3d 797 (7th Cir. 2008) (pre-*Boyle* decision rejecting complaint that contained "no reference to a system of governance, an administrative hierarchy, a joint planning committee, a board, a manager, a staff, headquarters, personnel having differentiated functions, a budget, records, or any other indicator of a legal or illegal enterprise"), *with Jay E. Hayden Foundation v. First Neighbor Bank, N.A.*, 610 F.3d 382, 388 (7th Cir. 2010) (setting forth pre-*Boyle* law defining a RICO enterprise and acknowledging that *Boyle* "throws [it] all in doubt"). The Court held in *Boyle* that a RICO enterprise's "decisions may be made on an ad hoc basis and by any number of methods," that "[m]embers of the group need not have fixed roles; different members may perform different roles at different times," and that "[w]hile the group must function as a continuing unit and remain in existence long enough to pursue a course of conduct, nothing in RICO exempts an enterprise whose associates engage in spurts of activity punctuated by periods of quiescence." *Id.* Therefore, under *Boyle*, a plaintiff must simply demonstrate basic three structural features in order to establish an enterprise: "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to continue to pursue the enterprise's purpose." *Id*; *see also Roa v. BP Products of North America, Inc.*, 589 F.3d 389, 399 (7th Cir. 2009).

Guaranteed Rate's Amended Complaint fails to establish a RICO enterprise because the allegations in the Amended Complaint do not demonstrate a common purpose, nor do they demonstrate a relationship among the RICO Defendants. The existence of a common goal or purpose is an "essential ingredient" of an association-in-fact enterprise. *Baker v. IBP, Inc.*, 357 F.3d 685, 691 (7th Cir. 2004) (citing *United States v. Turkette*, 452 U.S. 576, 583 (1981)); *see also Boyle*, 556 U.S. at 946 ("The concept of 'association' requires both interpersonal relationships and a common interest.") (internal quotations omitted). According to Guaranteed Rate's Amended Complaint, the ultimate goal of the alleged scheme was to "eliminate the personal liability of several Defendants under personal guaranties executed in connection with the construction loaned used to originally finance the [Development]." (Am. Complaint, ¶ 1.) However, Guaranteed Rate does not present a single factual claim asserting the RICO Defendants had any interest in the outcome of the alleged scheme beyond their own individual interests. For example, there is no indication in the Amended Complaint that the RICO Defendants shared in the profits of the alleged enterprise as opposed to merely taking their own respective profits from their respective actions related to the scheme. *See, e.g., Oberoi v. Mehta*, No. 10 C 7275, 2011 WL 1337107, at *4 (N.D. Ill. Apr. 6, 2011) (finding no RICO enterprise where defendants merely made their own respective profits and did not share in the profits of the alleged enterprise). Put another way, Guaranteed Rate fails to demonstrate that the RICO Defendants participated in the conduct of the enterprise's affairs, not just their own affairs. *See Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993) (RICO "liability depends on showing that the defendants conducted or participated in the conduct of the '*enterprise's* affairs,' not just their *own* affairs.") (emphasis in original).

Guaranteed Rate's RICO claim also fails because it has not demonstrated any relationship among the various RICO Defendants. The pleadings make clear that the alleged "enterprise" was nothing more than a group of otherwise unaffiliated individuals and entities—investors, developers, and attorneys—that came together to engage in RICO activities. *See Jennings*, 910 F.2d at 1440 ([An enterprise] is something more than a group of people go get together and agree to commit a pattern of racketeering activity.") (internal quotations omitted). Guaranteed Rate points to no facts establishing the RICO Defendants were affiliated with one another outside of the interaction necessary to commit the alleged predicate acts. *See, e.g., Starfish Inv. Corp. v. Hansen*, 370 F. Supp. 2d 759, 770 (N.D. Ill. 2005) (Castillo, J.) (In assessing whether the plaintiff has established a RICO enterprise, "it is appropriate for the Court 'to consider whether the enterprise would still exist were the predicate acts removed from the equation,' and whether the defendants' actions were motivated by anything other than self interest") (quoting *Okaya v. Denne Indus.*, No. 00 C 1203, 2000 WL 1727785, at *4 (N.D. Ill. Nov. 20, 2000)). While this may be enough to establish a common law fraud claim, it does not establish the requisite relationship among the defendants necessary to allege a RICO enterprise. Because Guaranteed Rate's Amended Complaint does not demonstrate a common purpose or relationship among the RICO Defendants, the Court finds that it has failed to plead facts sufficient to establish a RICO enterprise.

With respect to Lattas specifically, even if the Amended Complaint demonstrated the existence an enterprise, Guaranteed Rate pleads no facts establishing Lattas was a part of it. Guaranteed Rate has failed to show Lattas shared the enterprise's alleged goals, or had any interest in the real estate transactions other than serving as 13th & State's attorney at closing. Nor has Guaranteed Rate plead facts establishing Lattas actually *used* that enterprise to engage in a pattern

of racketeering activity. *See Jay E. Hayden Found.*, 610 F.3d at 388–89 (finding that while plaintiffs demonstrated a purpose, relationships, and longevity, they did not demonstrate that defendants were "*using* an enterprise to engage in a pattern of racketeering activity") (emphasis in original). According to the Amended Complaint, Lattas's role in the alleged enterprise was to insure that the sale of each unit in the Development closed properly by performing the services of a closing attorney on behalf of the seller, 13th & State. This "role" is indistinguishable from Lattas's position as legal representative for 13th & State. The Amended Complaint does not allege Lattas had an ownership interest in any of the property involved, shared in the profits of enterprise, or had any interaction with the so-called "enterprise" outside of the specific transactions alleged in the Amended Complaint. Nor does Guaranteed Rate claim that Lattas received an additional fee or incentive beyond its customary fee for acting as the seller's attorney at the real estate closings. An individual or entity that is a "mere hireling" of a member of an alleged enterprise "cannot be thought to have been conducting, or to have agreed to conduct, the affairs of [enterprise] through a pattern of racketeering activity." *Bachman v. Bear, Stearns & Co., Inc.*, 178 F.3d 930, 932–33 (7th Cir. 1999) (dismissing plaintiff's RICO claim against investment company hired to issue a fraudulent report undervaluing company stock because it was a "mere hireling, as shown by the fact that the only fee it received was its normal fee for determining a client's fair market value"). Furthermore, "[t]o be liable under § 1962(c), [a defendant] must participate in the operation or management of the enterprise itself, which means having some part in directing those affairs," *Richmond*, 52 F. 3d 640 (quoting *Reves*, 507 U.S. at 183), or exercising "some measure of control" over the enterprise. *Bachman*, 178 F. 3d at 932–33 (7th Cir. 1999). Aside from its claims that Lattas met with other defendants and directed or cooperated with GFI, which, as the Court has already stated, fail to meet Rule 9(b)'s particularity

23

requirement, Guaranteed Rate does not allege Lattas directed, controlled, or conducted any aspect of the alleged enterprise.

### IV. Guaranteed Rate has Failed to Plead Facts Establishing a Pattern of Racketeering Activity.

Even if Guaranteed Rate could demonstrate that the RICO Defendants formed an enterprise, its RICO claim would fail because it has not established that the RICO Defendants engaged in a "pattern of racketeering activity." The Seventh Circuit has acknowledged that "the tremendous breadth of the language of civil RICO has caused a large number of garden-variety fraud claims to be brought in federal court." *Morgan v. Bank of Waukegan*, 804 F.2d 970, 973 (7th Cir. 1986). However, to prevent RICO from being misused as a vehicle for federalizing state law fraud claims, the courts have sought to limit RICO's reach by requiring plaintiffs to demonstrate that defendants engaged in a sufficiently continuous "pattern of racketeering activity." *See H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 240–42 (1989); *Gamboa*, 457 F.3d at 710. A pattern of racketeering activity requires at least two predicate acts of racketeering within a ten year period. 18 U.S.C. § 1961(5); *see also Vicom*, 20 F.3d at 779. Establishing a pattern also requires a showing of the "continuity plus relationship" test: that the racketeering predicates are related to one another and pose a threat of continued criminal activity. *See Northwestern Bell*, 492 U.S. at 237 (holding that the definitions set forth in 18 U.S.C. § 1961 do "not so much define a pattern of racketeering activity as state a minimum necessary condition for the existence of such a pattern"); *see also Gamboa*, 475 F.3d at 706 ("[I]solated instances of criminal behavior, not presenting at least some threat of future harm, cannot meet § 1962(c)'s continuity element."). This approach recognizes that in enacting RICO, "Congress was concerned ... with long-term criminal conduct." *Vicom*, 20 F.3d at 780. In order to demonstrate sufficient relationship and continuity among the predicate acts, the plaintiff

must establish either (1) a series of related predicate acts extended over a substantial period of time – also known as "closed-ended continuity," or (2) that the past predicate acts by their very nature project into the future with a threat of repetition – known as "open-ended continuity." *See Northwestern Bell*, 492 U.S. at 241–242; *Jennings*, 495 F.3d at 473. Guaranteed Rate maintains it has shown both closed-ended and open-ended continuity; the Court finds it has shown neither.

## A. Closed-Ended Continuity

Closed-ended continuity "involves a course of criminal conduct which has come to a close." *Midwest Grinding Co.*, 976 F.2d at 1022. In order to establish closed-ended continuity, Guaranteed Rate must allege "a series of related predicates extending over a substantial period of time" such that the "duration and repetition of the criminal activity carries with it an implicit threat of continued criminal activity in the future." *Northwestern Bell*, 492 U.S. at 242; *Midwest Grinding Co.*, 976 F.2d at 1022–23. The Court considers the following factors in determining whether Guaranteed Rate's alleged pattern qualifies under the closed-ended continuity test: (1) the number and variety of predicate acts; (2) the length of time over which they were committed; (3) the number of victims; (4) the presence of separate schemes; and (5) the occurrence of distinct injuries. *See Morgan*, 804 F.2d at 975. While *Morgan* envisioned a fact specific inquiry, "with no one factor being necessarily determinative," *Id.* at 976, the second factor – duration – is considered to be the most important and the "closest thing [the Court has] to a bright-line continuity test." *Midwest Grinding Co.*, 976 F.2d at 1024; *see also Vicom*, 20 F.3d at 781 (recognizing duration as "the single most important aspect of the closed-ended continuity analysis"); *see also Jennings*, 495 F.3d at 473–74 ("The duration of the alleged racketeering activity is perhaps the most important element of RICO continuity."). Of course, as with most multi-factor inquiries, no single factor is dispositive. *See, e.g., Talbot v. Robert*

*Matthews Distributing Co.*, 961 F.2d 654, 663 (7th Cir. 1992) (finding no pattern where a single scheme occurred over a period of years); *Equity Residential v. Kendall Risk Mgmt, Inc.*, No. 04 C 2812, 2005 WL 1026686, at *10 n.7 (N.D. Ill. Apr. 12, 2005) (Gettleman, J.) (a "lengthy scheme alone is not sufficient to demonstrate a pattern").

In order to satisfy the duration requirement, the predicate acts must extend over a substantial period of time; a few weeks or months is considered insubstantial. *Midwest Grinding Co.*, 976 F.2d at 1024 (citing *Northwestern Bell*, 492 U.S. at 242). In this case, Guaranteed Rate alleges the RICO Defendants' devised the alleged scheme to sell the remaining Unsold Units in the Development in November of 2007. (Am. Complaint, ¶ 38.) The final real estate closing took place six months later on May 2, 2008.[5] (*Id.* ¶ 204.) Although the Seventh Circuit has not adopted a *per se* rule establishing how a long a scheme must last to satisfy the duration requirement in a closed-ended continuity analysis, the cases in this Circuit firmly demonstrate that racketeering activity having this kind of brief duration do not satisfy RICO's pattern requirement. *Compare Vicom*, 20 F.3d at 780 ("[A] time frame of less than nine months likely does not satisfy the duration requirement."), *Midwest Grinding Co.*, 976 F.2d at 1024 (nine-month period insufficient to satisfy duration factor of the continuity test), *Uni*Quality, Inc.,* 974 F.2d at 922 (predicate acts comprising "one scheme that lasted at most seven to eight months" was "precisely the type of short-term, closed-ended fraud that, subsequent to *Northwestern Bell*, this circuit consistently has held does not constitute a pattern"), *Marshall Intern., Inc. v. Redstart, Inc*, 935 F.2d 815, 821 (7th Cir. 1991) (13 months and relating to a single scheme with a single victim insufficient), *Short v. Belleville Shoe Mfg. Co.*, 908 F.2d 1385, 1393 (7th Cir.

<hr>

[5] Although Guaranteed Rate's pleadings with respect to Lattas's alleged involvement in the scheme in 2007 do not meet Rule 9(b)'s pleading requirements, the Court gives Guaranteed Rate the benefit of the doubt and proceeds under a more generous reading of Guaranteed Rate's Complaint for the purposes of the duration analysis.

1990) (four separate transactions spanning a four-to five-month period insufficient to establish pattern), *Olive Can Co., Inc., v. Martin*, 906 F.2d 1147, 1149 (7th Cir. 1990) (finding no pattern where a six-month scheme was set to end naturally with the repayment of a loan), *Sutherland v. O'Malley*, 882 F.2d 1196, 1204 (7th Cir. 1989) (no pattern where single scheme spanned a five-month period), *Starfish*, 370 F.Supp. At 776 (fourteen month period insufficient to meet duration requirement), *and Katris v. Doherty*, No. 01 C 6885, 2001 WL 1636914, at *8 (N.D. Ill. Dec. 19, 2001) (eleven to twelve month period insufficient), *with Morgan*, 804 F.2d 970 (reversing dismissal and finding RICO claim properly alleged where scheme lasted four-and-a-half years), *Equity Residential*, 2005 WL 1026686, at *8 (duration requirement satisfied where alleged scheme spanned five years), *and Shapo v. O'Shaughnessy*, 246 F.Supp. 2d 935, 960 (N.D. Ill. 2002) (St. Eve, J.) ("[I]t is hard to imagine that a pattern of seven years does not meet the minimum requirement.").

The remaining factors also weigh against a finding of closed-ended continuity. While a plaintiff need not prove multiple schemes to show a RICO pattern, *see Northwestern Bell*, 492 U.S. at 236–37 (rejecting circuit court's proposition that "predicate acts of racketeering may form a pattern only when they are part of separate illegal schemes"), the presence or absence of multiple schemes is highly relevant to the court's determination of whether a RICO pattern has been established. *See Gamboa*, 457 F.3d at 709 ("[W]hen ... a complaint explicitly presents a distinct and non-reoccuring scheme with a built-in termination point and provides no indication that the perpetrators have engaged or will engage in similar misconduct, the complaint does not sufficiently allege continuity for § 1962(c) purposes even if the purported scheme takes several years to unfold, involves a variety of criminal acts, and targets more than one victim."); *Talbot*, 961 F.2d at 663 (no pattern where a single scheme involving multiple acts of mail fraud occurred over a period of several

years and injuring more than one victim); *Olive Oil*, 906 F.2d at 1151 (no pattern where single scheme involved multiple acts of mail fraud); *Oberoi*, 2011 WL 1337107, at *3 (no pattern where fraudulent transactions at issue related to three separate closing dates that were part of a single broader scheme to defraud investors). Guaranteed Rate's Amended Complaint alleges a single scheme with a single point of completion, namely, the elimination of personal liability of the Guarantor Defendants. This counsel's against a finding of closed-ended continuity.

Next, Guaranteed Rate identifies only itself as a victim of the alleged RICO scheme. Courts have repeatedly found that the existence of only one victim cuts against closed-ended continuity. *See, e.g., Jennings*, 495 F.3d at 495 (finding no pattern in part based on the fact that plaintiff was the only identifiable victim); *Triad Assoc., Inc. v. Chicago Housing Authority*, 892 F.2d 583, 595 (7th Cir. 1989) (no pattern where one general scheme, two transactions-only one of which came to fruition, one victim, and one type of injury was alleged); *Equity Residential*, 2005 WL 1026686, at *9 (no pattern where plaintiffs identified only themselves as victims); *Meyer Material Co. v. Mooshol*, 188 F. Supp. 2d 936, 942 (N.D. Ill. 2002) (Castillo, J.) (no pattern where scheme occurred over four years and involved a single victim). Although the Amended Complaint references five other Unsold Units purchased by the Buyers through different lenders, Guaranteed Rate does not provide any details regarding those transactions aside from its claim that two of them involved representations that the buyer would maintain the unit as a primary residence. Guaranteed Rate does not allege the terms or circumstances of those sales, nor does it offer the identity of the lenders or claim that those units were sold at inflated prices. Accordingly, the Court determines that Guaranteed Rate is the only victim alleged in the scheme.

The last *Morgan* factor is whether a RICO plaintiff has alleged non-distinct injuries. Here, Guaranteed Rate alleges one kind of injury–economic loss resulting from the disbursement of funds based on false information. Although Guaranteed Rate alleges its injuries result from three separate transactions, courts have consistently viewed repeated economic injuries based on a single scheme to defraud as non-distinct. *See, e.g., Triad*, 892 F.2d at 595; *CIB Bank v. Esmail*, No. 04 C 4870, 2004 WL 3119027, at *6 (N.D. Ill. Dec. 28, 2005) (Aspen, J.) ("The occurrence of distinct injuries is the occurrence of different *types* of injuries, not multiple instances of the same injury.") (emphasis in original) (citing *U.S. Textiles*, 911 F.2d at 1269); *Meyer*, 188 F.Supp.2d at 941 (N.D. Ill. 2002) (finding no distinct injuries where the defendant repeatedly embezzled from the plaintiff using similar predicate acts as part of a single scheme); *VKS Investors v. VKS Management, Inc.*, No. 94 C 543, 1994 WL 722035, at *4 (N.D. Ill. Dec. 29, 1994) (loss of money resulting from two allegedly fraudulent offerings to potential investors as part of single scheme were not distinct injuries). Therefore, the final *Morgan* factor also weighs against Guaranteed Rate.

Having alleged a single scheme with only one victim over a period of six months, Guaranteed Rate now asks this Court to take judicial notice of three additional units sold by 13th & State involving different mortgage lenders.[6] Guaranteed Rate does not cite a single authority – nor could this Court find one – supporting such a peculiar use of judicial notice. A court may take judicial notice of an adjudicative fact that is both "not subject to reasonable dispute" and either: (1) "generally known within the territorial jurisdiction of the trial court" or (2) "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."

---

[6]Taking judicial notice of these transactions would expand the pool of victims from one to three, and broaden the time frame of the alleged scheme from six months to eighteen months.

Fed.R.Evid. 201(b); *see Hennessy v. Penril Datacomm Networks, Inc.*, 69 F.3d 1344, 1354 (7th Cir. 1995) ("In order for a fact to be judicially noticed, indisputability is a prerequisite."). Courts strictly adhere to this criteria because once a court takes judicial notice under Rule 201(b) in a civil case, "the court must instruct the jury to accept the noticed fact as conclusive." Fed.R.Evid 201(f). Details related to mortgage transactions involving other buyers and lenders do not remotely fall within the ambit of Rule 201; such details are not generally known in this or any other jurisdiction, nor are they capable of accurate and ready determination through undisputable sources. Accordingly, the Court will not use Federal Rule of Evidence 201 as an instrument to cure deficiencies in Guaranteed Rate's Complaint.

Next, Guaranteed Rate relies almost entirely on *Liquid Air Corp. v. Rogers* to support its position that the *Morgan* factors favor a finding of closed-ended continuity. In that case, the court found a continuous pattern of racketeering activity in a scheme that lasted seven months and involved only one victim. *Liquid Air Corp. v. Rogers*, 834 F. 2d 1297, 1304 (7th Cir. 1987). The court in *Liquid Air* noted that "[t]he mere fact that the predicate acts relate to the same overall scheme or involve the same victim does not mean that the acts automatically fail to satisfy the pattern requirement" *Id.* at 1304. The court also determined that "the repeated infliction of economic injury upon a single victim of a single scheme is sufficient to establish a pattern of racketeering activity for the purposes of civil RICO." *Id.* at 1305. *Liquid Air*, however, does not persuade the Court to find a pattern of racketeering activity in this case.

First, *Liquid Air* is distinguishable on the facts, as it involved nineteen separate acts of fraud, each one causing a separate and distinct injury to the plaintiff. *Id.* at 1304. Here, Guaranteed Rate alleges only three acts of fraud over a slightly shorter time period. Second, and more importantly,

*Liquid Air* predates the Supreme Court's decision in *Northwestern Bell*, where the Court refined the focus of the continuity component of the pattern requirement in civil RICO cases. *See 420 East Ohio Ltd. Partnership v. Cocose*, 980 F. 2d 1122, 1124 (7th Cir. 1992) (finding that after *Northwestern Bell*, the Seventh Circuit "examines the facts with an eye toward not only the *Morgan* factors, but also toward the [Supreme] Court's suggestion that continuity encompass a lengthy period of racketeering activity or threat of continued criminal activity"). Other district courts in this circuit have also recognized that *Liquid Air* has been partially abrogated by *Northwestern Bell*. *See, e.g., CIB*, 2004 WL 3119027, at *7 n. 5 (rejecting plaintiff's reliance on *Liquid Air* and three other cases predating *Northwestern Bell*, finding those cases "partially abrogated by [*Northwestern Bell*]"); *Equity Residential*, 2005 WL 1026686, at *10 n.7 ("*Liquid Air* was decided prior to the Supreme Court's decision in *Northwestern Bell*, which altered the pattern analysis, and this court is unable to identify any cases subsequent to *Northwestern Bell* in which the Seventh Circuit held that a pattern had been properly alleged or proved under the circumstances of *Liquid Air*."). This Court's own research yielded similar findings – an overwhelming number of cases Seventh Circuit decided after *Northwestern Bell* have consistently refused to find closed-ended continuity in cases involving a one type of injury resulting from a single scheme lasting less than two years. Accordingly, the Court finds Guaranteed Rate has not plead facts sufficient to established a pattern of racketeering activity under the closed-ended continuity test.

## B.     Open-Ended Continuity

Open-ended continuity exists when a plaintiff alleges "past conduct that by its nature projects into the future with a threat of repetition." *Northwestern Bell*, 492 U.S. at 241. Unlike RICO claims involving closed-ended continuity, a plaintiff may satisfy the pattern requirement under the open-

ended continuity test regardless of its brevity. *See Vicom*, 20 F.3d at 782; *see also Midwest Grinding Co.*, 976 F.2d at 1023 ("An open-ended period of racketeering ... is a course of criminal activity which lacks the duration and repetition to establish continuity."). A civil RICO plaintiff may establish open-ended continuity by demonstrated that a conspiracy, though short-lived, shows clear signs of threatening to continue in the future. *Midwest Grinding Co.*, 976 F.2d at 1024. In order to do so, the plaintiff must show: (1) a "specific threat of repetition"; (2) that the "predicate acts or offenses are part of an ongoing entity's regular way of doing business; or (3) that defendants operate a "long term association that exists for criminal purposes." *Id.* at 1023 (quoting *Northwestern Bell*, 492 U.S. at 242–43); *see also Vicom, Inc.*, 20 F.3d at 782.

None of these circumstances are present in this case. There is no specific threat of repetition because the alleged scheme has come to its natural end. "[S]chemes which have a clear and terminable goal have a natural ending point. Such schemes therefore cannot support a finding of any specific threat of continuity that would constitute open-ended continuity." *Vicom*, 20 F.3d at 782–83. For example, in *Olive Can Co., Inc. v. Martin*, the Court found no continuity based "primarily on the undisputed evidence that the purpose of the alleged fraudulent scheme was to pay [the defendant's] loan. The scheme, therefore, had a natural ending with no threat of continued criminal activity." *Olive Can*, 906 F. 2d at 1151. The Court determined that "[t]his single scheme was to be short-lived and there is no evidence that, had the scheme worked, it would have repeated in the future." *Id.*

The circumstances in this case are analogous. Guaranteed Rate alleges in its Amended Complaint that the purpose of the scheme was to sell the remaining Unsold Units to generate funds that would pay off 13th & State's loan from IndyMac Bank in order to eliminate the personal liability

of the Guarantor Defendants. (Am. Complaint, ¶¶ 1, 33.)  Were the RICO Defendants to achieve that

goal, the alleged scheme would have come to its natural end.  No Unsold Units would remain, and

the Guarantor Defendants would no longer be on the hook for any losses arising from 13th & State's

failure to sell the remaining units in the Development.

Nevertheless, Guaranteed Rate urges in its response brief that the alleged scheme, "by its very

nature ... is capable of repetition and poses a clear and present danger of repetition." (Resp. Brief,

p. 11).  According to Guaranteed Rate, "[t]he scheme, as designed and carried out, can be used by

the defendants to sell condominium units and other real property."  However, Guaranteed Rate

pleads no facts in its Amended Complaint and offers no insight in its brief as to why this is the case.

Aside from the fact that it is still generally possible for a group of individuals and entities to engage

in real estate fraud in the manner alleged, it is unclear what natural feature of the alleged scheme

renders it so uniquely susceptible to repetition so as to warrant a finding of open-ended continuity.

Nor has Guaranteed Rate sufficiently alleged that the Defendants' predicate acts are part of

an ongoing entity's regular way of doing business.  There are no allegations suggesting the RICO

Defendants comprised an ongoing entity, or that the predicate acts of fraud reflect any defendant's

ongoing way of doing business.  Finally, Guaranteed Rate has not shown the Defendants' operated

a long term association that existed for criminal purposes.  Guaranteed Rate does not allege the

RICO Defendants were affiliated with one another before November of 2007, nor has it plead that

they maintained a relationship for the purposes of engaging in criminal activity after engaging in the

alleged predicate acts.  The only allegation in Guaranteed Rate's Amended Complaint that even

remotely alludes to a threat of future repetition appears in paragraph 250, where Guaranteed Rate

asserts "[o]n information and belief, and at all times relevant herein, the RICO defendants had a

working relationship which continues to this day." (Am. Complaint, Count I, ¶ 250.)  As this Court has already stated, allegations framed in this manner are insufficient unless they are accompanied by facts providing a basis for the plaintiff's belief.  *Uni*Quality*, 974 F.2d at 923.  Here, Guaranteed Rate offers no facts to support its belief that the RICO Defendants continue to maintain a working relationship.  Rather, the allegations in the Amended Complaint demonstrate that the RICO Defendants were nothing more than a group of unrelated individuals and entities who came together and defrauded Guaranteed Rate in order to reap separate profits.

Guaranteed Rate cites, without analysis, a string of cases to support its position that open-ended continuity exists in this case.[7]  Not one of them is on point.  Most of the cases cited by Guaranteed Rate are distinguishable on the facts.  *Phillips* and *Liquid Air* involved nine and nineteen separate acts of fraud, respectively, not three.  *Horak* involved a scheme that lasted several years, not six months.  The defendants in *Ashland Oil* harmed four different victims through a variety of predicate acts, including wire fraud, bankruptcy fraud, and arson; here, Guaranteed Rate alleges one victim with a smaller variety of predicate acts.  Second, every case Guaranteed Rate cites predates the Supreme Court's decision in *Northwestern Bell*, which, again, narrowed the continuity element of civil RICO's pattern requirement. *See, e.g., 420 East Ohio*, 980 F. 2d at 1124; *CIB*, 2004 WL 3119027, at *7 n. 5; *Equity Residential*, 2005 WL 1026686, at *10 n.7.  Third, the cases cited by Guaranteed Rate do not apply the open-ended continuity test.  Indeed, *any* plaintiff would be hard-pressed to find support for a finding of open-ended continuity in cases predating *Northwestern Bell*

---

[7]Guaranteed Rate cites *Ashland Oil Inc. v. Arnett*, 875 F. 2d 1271 (7th Cir. 1989); *United States v. Horak*, 833 F. 2d 1235 (7th Cir. 1987); *Appley v. West*, 832 F. 2d 1021 (7th Cir. 1987); *Liquid Air Corp. v. Rogers*, 834 F. 2d 1297 (7th Cir. 1987); and *Illinois Dep't of Revenue v. Phillips*, 771 F. 2d 312 (7th Cir. 1985).

because the pattern-of-activity inquiry had not been parsed into the closed-and open-ended tests until *Northwestern Bell*. Therefore, the Court does not find these cases instructive.

For the reasons stated, Guaranteed Rate is unable to allege a pattern of racketeering activity or an enterprise as required by RICO. Count I of Guaranteed Rate's Complaint is therefore dismissed, with prejudice, pursuant to Fed.R.Civ.P. 12(b)(6).

### V.    The Court Relinquishes its Supplemental Jurisdiction Over the Remaining State Law Claims

Once Guaranteed Rate's RICO claim – the sole premise of federal jurisdiction here – is dismissed, there remain nineteen state law causes of action. All nineteen of these claims arise from the same nucleus of operative facts as Guaranteed Rate's RICO claims in Count I. However, where "the sole basis for invoking federal jurisdiction is non-existent ... the federal courts should not exercise supplemental jurisdiction over his remaining state law claims." *Aztar Ind. Gaming*, 351 F. 3d 294, 300 (7th Cir. 2000); *see also Al's Service Center v. BP Products North America, Inc.*, 599 F.3d 720, 727 (7th Cir. 2010) ("When all federal claims in a suit in federal court are dismissed before trial, the presumption is that the court will relinquish federal jurisdiction over any supplemental state-law claim."); *Rennell v. Rowe*, No. 09 C 2193, 2010 WL 99409, at *3 (Pallmeyer, J.) (declining to exercising supplemental jurisdiction over remaining state law claims after dismissing plaintiff's RICO claims).

There are three exceptions to this general rule: (1) when the refiling of the state claims is barred by the statute of limitations; (2) where substantial judicial resourcse have already been expended on the state claims; and (3) when it is clearly apparent how the state claim is to be decided. *Williams v. Rodriguez*, 509 F. 3d 392 (7th Cir. 2007) (citing *Wright v. Associated Ins. Companies, Inc.*, 29 F. 3d 1244, 1251 (7th Cir. 1994); *Williams Electronic Games, Inc. v. Garrity*, 479 F. 3d 904,

906 (7th Cir. 2007)). None of these exceptions apply to Guaranteed Rate's state law conspiracy to defraud, breach of contract, breach of fiduciary duty, common law fraud, negligent misrepresentation, or negligence claims. First, because these claims are being dismissed on jurisdictional grounds, Illinois law gives Guaranteed Rate one year to refile them in state court. *See* 735 ILCS 5/13–217 ("[If] the action is dismissed by a United States District Court for lack fo jurisdiction, ... then, whether or not the time limitation for bringing such action expires during the pendency of such action, the plaintiff ... may commence a new action [in state court] within one year or within the remaining period of limitation, whichever is greater, after ... the action is dismissed by a United States District Court for lack of jurisdiction ..."); *Davis v. Cook County*, 534 F. 3d 650, 654 (7th Cir. 2008). Second, as the Court has disposed of the federal claims on a motion to dismiss, "substantial judicial resources" have not yet been committed to the case. *See, e.g., Davis*, 534 F. 3d 650 (no substantial resources committed where federal claims dismissed at summary judgment phase). Lastly, it is not "clearly apparent" how Guaranteed Rate's state law claims will be decided.

Finding no justification to depart from the general rule requiring dismissal of supplemental state law claims in these circumstances, the Court declines to exercise supplemental jurisdiction over the remaining state law claims pursuant to 28 U.S.C. § 1367(c)(3).

### VI.    Warren Barr's Motion to Vacate Default Judgment

On October 30, 2012, this Court entered an Order of Default against Defendant Warren Barr. (Dkt. No. 119.) Barr was served with the Complaint and Summons on July 26, 2012, (Dkt. No. 78), but failed to timely appear, file an Answer, or otherwise respond to Guaranteed Rate's Complaint or Amended Complaint. Barr maintains he was unable to timely respond to the because he was in Saudi Arabia for an extended period of time and returned to the United States on October 30, 2012,

36

the same day the Order of Default was entered against him.  Barr states that he was attempting to

settle this case and was in the process of retaining counsel while working full-time overseas, but was

unable to arrive at a final representation agreement with his current counsel, Joseph T. Gentleman,

until October 31, 2012.  On November 2, 2012, three days after the Order of Default was entered

against him, Barr filed a Motion a Motion for Leave to Appear, Vacate Default, and for Extension

of Time to Answer.

A district court may in its discretion set aside an entry of default for "good cause" under

Federal Rule of Civil Procedure 55(c), or vacate a default judgment under the rationales set forth in

Rule 60(b). Fed.R.Civ.P. 55(c), 60(b); *see also Judson Atkinson Candies, Inc. v. Latini-Hohberger*

*Dhimantec*, 529 F.3d 371, 385 (7th Cir. 2008).  Rule 55 governs in this case because the Court has

made an entry for default against Barr but has not yet entered a final default judgment awarding

damages to Guaranteed Rate. *See Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 630 (7th Cir. 2009).

The Seventh Circuit has provided somewhat conflicting guidance with respect to Rule 55(c)'s "good

cause" standard.  In *Sims v. EGA Prods., Inc.*, 475 F.3d 865 (7th Cir. 2007), the court explained that

a defaulting party need not demonstrate a good reason for the failure that led to the default in order

to have that default set aside.  Rather, the court held that "Rule 55(c)  requires 'good cause' for the

judicial action, not 'good cause' for the defendant's error; as used in this Rule, the phrase is not a

synonym for 'excusable neglect.' " *Id.* at 868.  The court in *Sims* determined there was good cause

to set aside the entry of default "even though there was no good excuse for the defendant's

inattention to the case." *Id.*  This proposition was cited with approval (albeit parenthetically) in

*Cracco v. Vitran Exp., Inc.*, 559 F.3d at 630.  However, *Cracco* also appears to contradict *Sims* by

applying to Rule 55(c) the same test used by courts to determine whether to vacate a default

judgment under Rule 60(b). *Id.* That test places a heavier burden on the defaulting party, as it requires the defaulting party to demonstrate (1) good cause for the default, (2) quick action to correct the default, and (3) a meritorious defense to the Complaint. *United States v. Di Mucci*, 879 F.2d 1488, 1495 (7th Cir. 1989); *Breuer Elec. Mfg. v. Toronado Sys. of Am.*, 687 F.2d 182, 185 (7th Cir. 1982). However, *Cracco* recognized that this test is "more liberally applied in the Rule 55(c) context," and ultimately set aside the default judgment entered against the defendant because the defendant "did not wilfully ignore the pending litigation, but, rather, failed to respond to the summons and complaint through inadvertence" and responded to the entry of default within eight days satisfied the first two prongs of the test. *Cracco*, 559 F.3d at 631.

Here, although Barr was clearly aware of the lawsuit against him during the time he was overseas and should have been more diligent in participating in this litigation, he did not "willfully ignore" the pending litigation. Rather, he was remotely (and albeit sluggishly) attempting to retain counsel to represent him in this case. Furthermore, Barr acted quickly to correct his default by filing the instant motion just three days after the entry of default. *See, e.g., Cracco*, 559 F.3d at 631 (filing motion to set aside eight days after entry of default constituted "quick action"); *Indian Ind., Inc. v. Rainbow Play Systems, Inc.*, No. 3:11-cv-139-RLY-WGH, 2012 WL 1409637, *2–3 (S.D. Ind. Apr. 23, 2012) (setting aside default judgment where defaulting party hired counsel and filed an answer and counterclaim four days after entry of default); *Armfield v. Key Plastics, LLC*, , 2008 WL 2397684, at *1 (N.D. Ind. June 9, 2008) (setting aside where motion to vacate was filed "a few days after default was entered"). Lastly, and most obviously, Barr has a meritorious defense in this case. The Court has determined that Guaranteed Rate's has failed to state a claim under RICO, dismissed Count I of the Amended Complaint, and declined to exercise supplemental jurisdiction over Counts

II and IX, the only remaining causes of action against Barr. Where a court determines it no longer has jurisdiction over a case, it may, in its discretion, vacate or set aside a default judgment entered against a defendant. *See, e.g., Gee Chan Choi v. Jeong-Wha Kim*, No. 04-CV-4693, 2006 WL 3535931, at *11 (S.D.N.Y. Dec. 7, 2006) (setting aside order of default previously entered against defendants after dismissing plaintiff's RICO claim for failure to allege the existence of an enterprise or pattern of racketeering activity and refusing to exercise supplemental jurisdiction over plaintiff's remaining state law claims); *APCO Willamette Corp. v. PI.T.W.U. Health & Welfare Fund*, 390 F.Supp. 2d 696, 700–701 (N.D. Ill. 2005) (vacating default judgments previously entered against five defendants after determining the court had no jurisdiction over the case because the plaintiff lacked standing). Accordingly, the Court finds it appropriate to set aside the default judgment previously entered against Barr.

Nevertheless, the Court recognizes that Guaranteed Rate's counsel was forced to unnecessarily expend time and effect resources as a result of Barr's inattention to this case. Had Barr acted in a timely fashion, Guaranteed Rate would not have had to move for default or respond to Barr's Motion to Vacate. Therefore, the Court awards Guaranteed Rate their actual attorneys' fees and costs associated with filing their Motion for Default and response to Barr's Motion to Vacate Default Judgment.

## CONCLUSION AND ORDER

For the reasons stated, Lattas's Motion to Dismiss Count I is granted with prejudice. The Court chooses to relinquish supplemental jurisdiction over the remaining state law claims, Counts II through XX are dismissed without prejudice to re-file these claims in state court, and Stewart Title, Cagala, Budzik, Budzik & Dynia, LLC, the RJE Defendants, Kim, Jilek, Southwest Appraisal, and

Lupescu's Motions to Dismiss are denied as moot. Barr's Motion to Vacate is granted, and Guaranteed Rate is awarded actual attorneys fees associated with the filing of their Motion for Default Judgment and response to Barr's Motion to Vacate.

Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: December 12, 2012